IN RE the MARRIAGE OF: Robert Booth FOWLER,
Petitioner-Respondent,

v.

Emily Albrink FOWLER, Appellant.†

Court of Appeals

*No. 89-0763. Submitted on briefs January 12, 1990.—Decided
October 4, 1990.*

(Also reported in 463 N.W.2d 370.)

†Petition to review denied.

511

For the appellant the cause was submitted on the briefs of *Michael J. Collins* of *Collins, Beatty & Krekeler, S.C.,* of Madison.

For the petitioner-respondent the cause was submitted on the brief of *Steven A. Bach* and *Cheryl Rosen Weston* of *Cullen, Weston, Pines & Bach* of Madison.

Before Eich, C.J., Dykman and Sundby, JJ.

SUNDBY, J. During her marriage to Robert Booth Fowler, Emily Fowler inherited stock and securities, including shares in AT&T. Her appeal from the divorce judgment raises questions not previously addressed as to whether growth in inherited stock by substitution and dividend reinvestment is included in the marital estate for division under sec. 767.255, Stats.

We conclude: (1) The circuit court erred when it included in the marital estate stock substituted for inherited AT&T stock. (2) The circuit court correctly included in the marital estate stock acquired by Emily through dividend reinvestment and stock purchase plans in effect with respect to inherited stock.[1] (3) The circuit

---

[1] We reserved this issue in *Arneson v. Arneson,* 120 Wis. 2d 236, 245 n.6, 355 N.W.2d 16, 20 (Ct. App. 1984).

court correctly included in the marital estate stock purchased with commingled cash gifts.

In addition to her challenge to the property division, Emily claims that the circuit court abused its discretion in failing to consider the tax consequences to her of the property division; in failing to award her maintenance; in awarding to Booth[2] the income tax dependency exemption for the parties' minor child; and in failing to explain why it accepted Booth's valuation of his pension plan and rejected Emily's valuation.

We conclude that the circuit court did not abuse its discretion in any of the claimed respects. We therefore affirm the judgment in part and reverse in part and direct that the circuit court exclude from the marital estate the shares of stock acquired by Emily as a result of the AT&T divestiture.

## BACKGROUND

Robert Booth Fowler was born May 16, 1940 and is a professor at the University of Wisconsin—Madison. His monthly gross earnings are $5,191.

Emily Fowler was born August 7, 1946 and is a professor at the University of Nebraska Law School. Her monthly gross earnings are $3,767.77. The parties were married on March 6, 1971 and a child, Benjamin, was born to them October 7, 1976.

Prior to the divorce hearing, Booth and Emily entered into a partial marital settlement agreement which settled many of the issues between them. The circuit court rendered its oral decision on the unsettled issues at the August 4, 1988 hearing and entered its

---

[2]In the testimony and the briefs, Robert's middle name is used.

findings of fact, conclusions of law and judgment on February 28, 1989.

## I.

## PROPERTY DIVISION

Section 767.255, Stats., excludes from the marital estate subject to division any property acquired by either party prior to or during the marriage by gift, bequest, devise or inheritance, except upon a finding of hardship. During the marriage, Emily inherited sixty-five shares of AT&T stock, six and one-half shares of Sun stock and 250 shares of Liberty/Knickerbocker stock. Booth concedes that these shares are not part of the marital estate. The disputed stock was acquired in three ways: by substitution of stock in the so-called "Baby Bells" for AT&T stock as a result of the AT&T divestiture; by reinvestment of dividends in additional shares of stock of the corporation declaring the dividends; and by purchases with cash gifts from Emily's father.

### (a)

### Substitution of Stock

In *Arneson v. Arneson,* 120 Wis. 2d 236, 355 N.W.2d 16 (Ct. App. 1984), we held that bonds purchased with dividends from inherited stock were includable in the marital estate. We said:

> [W]e view income generated by an asset as separate and distinct from the asset itself. We also view such income separate and distinct from the appreciation of the asset itself. We see nothing in the developing Wisconsin law excluding appreciation of gifted or inherited property from a marital estate as mandat-

515

ing that property purchased with the income from such property also be excluded.

*Id.* at 244–45, 355 N.W.2d at 20.

The "Baby Bells" stock which Emily acquired in the AT&T divestiture was not income generated by the inherited AT&T stock. Nor did Emily purchase the stock. The "Baby Bells" stock was merely substituted for AT&T stock.[3] The substitution did not effect a transmutation of non-marital property to marital property. *See Popp v. Popp,* 146 Wis. 2d 778, 788, 432 N.W.2d 600, 603 (Ct. App. 1988) (Transmutation can occur when the character of non-marital property is changed). The character of Emily's inherited property did not change. It remained stock titled in her name. There is no evidence of Emily's actual or constructive donative intent. Such intent is requisite to transmutation. *Id.* at 789, 432 N.W.2d at 603. We therefore conclude that the circuit court erroneously included such stock in the marital estate.[4]

---

[3] *See United States v. American Telephone & Telegraph Co.,* 552 F. Supp. 131 (D.D.C. 1982), *aff'd,* 460 U.S. 1001 (1983), for a description of the AT&T divestiture.

[4] *Lendman v. Lendman,* 157 Wis. 2d 606, 460 N.W.2d 781 (Ct. App. 1990) is inapposite. In *Lendman,* we held that appreciation in value of inherited stock in a closely held corporation through corporate debt retirement was marital property. The appreciation in value resulted from the application of income which we said in *Arneson* was "separate and distinct" from the stock itself. Emily's stock in the "Baby Bells" was not acquired with income generated by her inherited AT&T stock.

**(b)**

### Dividend Reinvestment

As to the additional shares of stock in AT&T and the "Baby Bells" acquired through dividend reinvestment and stock purchase plans, however, we conclude that *Arneson* controls. The dividends constituted income generated by the stock asset rather than appreciation in value of the asset itself. The fact that Emily chose to reinvest the stock dividends in other like stock rather than purchasing other property, as in *Arneson,* does not provide a difference sufficient to distinguish the situation here from that involved in *Arneson.* We therefore conclude that the circuit court properly included in the marital estate the stock acquired by Emily through the dividend reinvestment and stock purchase plans.

**(c)**

### Purchase With Cash Gifts

From time to time, Emily's father gave her checks. Emily endorsed the checks and gave them to Booth who deposited them in the parties' joint checking account or in his savings account. Booth drew on their accounts to purchase stock in Emily's name. The circuit court concluded that by endorsing the checks and permitting her husband to deposit them in his savings account or in their joint checking account, Emily intended to make a gift of the checks to the family and they thereby lost their character as gifts to her. The circuit court further concluded that the gifts were so commingled with funds from other sources that they lost their identity.

We consider first the deposit of Emily's gift proceeds into the parties' joint bank account. "The transfer of separately owned property into joint tenancy changes the character of the ownership interest in the entire property into marital property which is subject to division." *Trattles v. Trattles,* 126 Wis. 2d 219, 225–26, 376 N.W.2d 379, 383 (Ct. App. 1985). Therefore, the gifts to Emily which were placed in the parties' joint checking account lost their character as Emily's separate property. Consequently, inquiry into the identity issue is unnecessary. *See id.* at 227–28, 376 N.W.2d at 384.

As to the gifted property placed in Booth's savings account, Booth's uncontradicted testimony was that this account included some of his wages, additional money that he earned, money that came into the family and money earned by Emily. The circuit court concluded that therefore these gifts lost their identity through commingling. The circuit court's finding is not clearly erroneous and we must accept it. Sec. 805.17(2), Stats. We therefore conclude that the trial court correctly included in the marital estate the stock purchased with funds drawn from the parties' joint checking account or from Booth's savings account.

II.

TAX CONSEQUENCES

The circuit court did not consider the tax consequences of its division of the marital estate. In dividing the marital property upon divorce, the circuit court is directed to consider the tax consequences to each party. Sec. 767.255(10), Stats; *Ondrasek v. Ondrasek,* 126 Wis. 2d 469, 480, 377 N.W.2d 190, 194 (Ct. App. 1985). How-

ever, neither party presented the circuit court with evidence from which the court could determine the tax consequences of the property division. The trial court is not an advocate; it is not up to the court to provide the evidence. Rather, it is the court's responsibility to decide on the basis of the evidence. If the parties do not present the trial court with any evidence or other reliable data as to the tax consequences of the court's decision, the court does not abuse its discretion in failing to take those consequences into consideration. *Brandt v. Brandt,* 145 Wis. 2d 394, 420, 427 N.W.2d 126, 135–36 (Ct. App. 1988).

## III.

## MAINTENANCE

The determination of the amount and duration of maintenance is in the discretion of the circuit court, and we will not disturb the determination of the court unless it abuses its discretion. *LaRocque v. LaRocque,* 139 Wis. 2d 23, 27, 406 N.W.2d 736, 737 (1987).

At the time of the hearing, the parties had been married seventeen years. Between them they had achieved increased earnings. The principles of *LaRocque,* therefore apply to this marriage. *See id.* at 39, 406 N.W.2d at 742 (over long marriage, parties each contribute to stream of income as marital partners and should share the rewards). Sharing the rewards of the stream of income produced in a long marriage is encompassed in the fairness objective of maintenance. *Id.* The other objective of maintenance is support. *Id.* at 33, 406 N.W.2d at 740. The circuit court abuses its discretion if it does not give full play to these objectives or if it misap-

519

plies or fails to apply the statutory factors of sec. 767.26, Stats., to its decision as to maintenance. *Id.*

Emily claims that the court gave no consideration to her uncontradicted testimony as to her diminished standard of living. She asserts that the circuit court erroneously found that she was able to complete her education only because of Booth's ability to earn income. Emily also claims that the court failed to consider the inequity of her foregone employment opportunities and the detriment that this worked on her professional career. She contends that the circuit court relied on the essentially sexist inference that a good wife follows her husband's career regardless of the damage to her own.

Emily also contends that the circuit court abused its discretion in the way in which it conducted the trial. Emily claims that the circuit court prevented her from presenting her evidence with respect to her professional career development and her substantial contributions to, and sacrifices for, the marriage. She asserts that the circuit judge's actions and comments had a "chilling effect" on the presentation of her case.

(a)

Support Objective

The goal of the support objective of maintenance is to provide the recipient spouse with support at predivorce standards. *LaRocque,* 139 Wis. 2d at 35, 406 N.W.2d at 741. This goal may require that the recipient spouse be awarded maintenance beyond bare subsistence needs. *Id.*

The circuit court distinguished *LaRocque* and *Bahr v. Bahr,* 107 Wis. 2d 72, 85, 318 N.W.2d 391, 398 (1982) (It is reasonable to begin maintenance evaluation with

proposition that dependent partner may be entitled to fifty percent of the parties' total earnings) from this case for two reasons. First, Emily demonstrated sufficient earning ability to support herself. Second, Emily accepted reduced earnings by abandoning the practice of law to teach.

We conclude that the circuit court's maintenance award conforms to the *LaRocque/Bahr* standards. It was therefore unnecessary for the court to distinguish these two cases. In *LaRocque,* the court recognized that the goal of maintenance to provide support at pre-divorce standards may be unattainable because of the increased expenses of separate households. *LaRocque,* 139 Wis. 2d at 35, 406 N.W.2d at 741. The court said that both parties may have to bear the sacrifices that the cost of an additional household imposes. *Id.*

The *LaRocque/Bahr* standard is that a court must not reduce the recipient spouse to the subsistence level while the payor spouse preserves the pre-divorce standard of living. *Id.* That standard is met. Emily clearly demonstrated the ability to support herself at her pre-divorce standard of living. Her annual income while she was actively engaged in the practice of law was $34,867 in 1984, $46,709 in 1985 and $47,112 in 1986. It is true that her income dropped dramatically—to $26,958.84 in 1987—when she elected to discontinue the practice of law to teach. The circuit court correctly concluded, however, that Emily could not make a career choice which involved a substantial reduction in her earning capacity and simultaneously insist that her husband support her at the standard of living she enjoyed while she was employed in her previous employment.

In *Bahr,* the court said, "When the dependent party is capable of accepting reasonably available, gainful

employment, we do not believe the dependent party can avoid such employment and simply rely upon the supporting party to provide a standard of living for the dependent party comparable to that enjoyed during the marriage." *Bahr,* 107 Wis. 2d at 83, 318 N.W.2d at 397-98. Emily has not refused to accept gainful employment. She chose, however, to substantially reduce the income available to her. We do not believe that she can make a career choice which substantially reduces her income and rely on Booth to provide her with the same standard of living she enjoyed during the marriage. We do not hold that the recipient spouse automatically disqualifies himself or herself from an award of maintenance if he or she makes a career choice which results in reduced income. However, that choice is "a significant factor" which the trial court may consider in awarding maintenance. *Bahr,* 107 Wis. 2d at 83, 318 N.W.2d at 397. *See also Roellig v. Roellig,* 146 Wis. 2d 652, 431 N.W.2d 759 (Ct. App. 1988) (trial court may consider voluntary termination of well-paying job in determining whether there has been a substantial change in financial circumstances). The circuit court considered as a significant factor in determining maintenance, Emily's voluntary abandonment of employment which produced income commensurate with her earning capacity.

The circuit court also found that there would not be a post-divorce substantial disparity between Emily's and Booth's incomes. The court's finding that Emily would earn approximately $3,760 per month is not challenged. Nor is the court's finding that, after payment of child support, Booth would have a gross income of $4,363 per month.

We conclude that the circuit court properly considered the support objective of maintenance.

## (b)

### Fairness Objective

The fairness objective of maintenance requires that the trial court give weight to such statutory factors as the length of the marriage, the educational level of each party at the time of the marriage and at the time of the divorce, and the contribution by one party to the education, training or increased earning power of the other. *LaRocque,* 139 Wis. 2d at 37, 406 N.W.2d at 741. If one spouse has "subordinated his or her education or career to devote time and energy to the welfare, career or education of the other spouse or to managing the affairs of the marital partnership, maintenance may be used to compensate this spouse for these nonmonetary contributions to the marriage." *Id.,* 406 N.W.2d at 741–42.

The circuit court recognized that this was a 17-year marriage. The court's finding that because of Booth's earning ability, Emily was able to complete her education, is not clearly erroneous. Emily obtained a masters degree in political science from the University of Wisconsin-Madison in 1970. At the time she married Booth in March, 1971, she was working toward a doctorate in political science. She received her Ph.D. in 1975. She then entered the University of Wisconsin Law School and graduated in 1978. From 1972 through 1978, Emily was employed as a half-time assistant to the associate dean in the undergraduate college. In the year when she was writing her dissertation, she worked full time as assistant dean. During these years, except for 1975, there was a substantial disparity between Booth's income and Emily's income. For example, in 1977 Booth's income was $22,437.67 while Emily's income was $1,705.61. In

1978, Booth's income was $22,021.33 while Emily's income was $1,579.60.

The record establishes that Emily did not subordinate her education or career to devote time and energy to Booth's welfare, career or education or to manage the affairs of the marital partnership. She does not leave the marriage educationally, economically or socially deprived.

Emily correctly notes that the circuit court exhibited some impatience with Emily's proof in two areas. First, that Booth refused to consider the possibility of obtaining employment in the areas of the country where Emily had job opportunities. Second, that even while Emily was working, she participated in the housework and child care.

Despite the circuit court's expressed skepticism as to Emily's evidence in these respects, a fair reading of the record reveals that the circuit court allowed Emily to present her evidence. She made her point that her career choices were limited because of Booth's failure to obtain employment in areas of the country where Emily had employment opportunities, and that she did contribute to the marriage and their child.

Emily claims that Booth exercised a geographic "veto" over her career choices. There is no evidence that he persuaded Emily to sell her Wisconsin law practice. When she had a job opportunity in North Carolina, Booth sought employment in North Carolina and, in fact, taught part-time at the University of North Carolina—Charlotte. He was unable to find a full-time job at the university. He also investigated openings at Duke or the University of North Carolina—Chapel Hill and interviewed at Davidson College. When Emily obtained her position at the University of Nebraska, Booth indicated a willingness to maintain a commuting relation-

ship. The circuit court's comment that it was unrealistic to expect that Booth would leave his position at the university and "[traipse] all over the country" so that Emily could become employed where she had opportunities must be considered in the context of the uncontradicted evidence that Booth had made numerous attempts to do just that. Emily's suggestion that the circuit court's "traipsing" comment was "sexist" is unfair.

Emily was not in a position similar to Mrs. LaRocque. Mrs. LaRocque had been a full-time homemaker for more than twenty years and had limited employment potential because of her lengthy absence from the job market. The record was replete with evidence of Mrs. LaRocque's contributions to Mr. LaRocque's education and increased earning power. *LaRocque,* 139 Wis. 2d at 38, 406 N.W.2d at 742. Booth, on the other hand, at the time of marriage, had completed his education and was employed as a professor of political science at the University of Wisconsin—Madison. Emily did not contribute to Booth's completion of his education, and there is no evidence that she contributed to his earning power.

Our review of the record fails to disclose that Emily was foreclosed from presenting evidence as to any unique contribution which she may have made to the marriage. We therefore reject her claim that the circuit court failed to allow her to present her case with respect to the fairness objective of maintenance. She presented her case but she did not persuade the circuit court. Nor does she persuade us.

(c)

## Conduct of Trial

We must address Emily's claim that the circuit judge's behavior and comments "were so egregious as to border on a violation of SCR 60.01(9)." This is a serious charge and we have examined the record to see if the allegations are supported by the record. We conclude that they are not.

Supreme Court Rule 60.01(9) provides in part: "A judge should so act during trials and hearings that his or her attitude, manner or tone toward counsel or witnesses will not prevent the proper presentation of the cause or the ascertainment of the truth." From our review of the record, we conclude that the charge against the trial judge is baseless. Counsel is reminded that while he must zealously assert the client's position, "[a] lawyer should demonstrate respect for the legal system and for those who serve it, including judges, other lawyers and public officials." SCR ch. 20, Preamble (West 1990). Counsel's characterization of the behavior and comments of the circuit judge as "egregious" and bordering on a violation of the Code of Judicial Ethics exceeds the bounds of zealous advocacy.

## IV.

## INCOME TAX DEPENDENCY EXEMPTION

An award of child support is within the discretion of the circuit court and will not be overturned unless the court abuses its discretion. *Wallen v. Wallen,* 139 Wis. 2d 217, 223, 407 N.W.2d 293, 295 (Ct. App. 1987). A

provision in a divorce judgment awarding the income tax dependency exemption for a minor child is an aspect of child support. *Peters (Oatman) v. Peters,* 145 Wis. 2d 490, 493, 427 N.W.2d 149, 151 (Ct. App. 1988).

Emily contends that the circuit court abused its discretion in awarding the income tax dependency exemption to Booth because the court's determination was based on a mistake of fact. A trial court abuses its discretion when it makes a mistake with respect to the facts upon which its decision is based. *Rommelfanger v. Rommelfanger,* 114 Wis. 2d 175, 177, 337 N.W.2d 851, 852 (Ct. App. 1983).

The circuit court stated, "As to the question of who takes Benjamin as an income tax deduction, Dr. Fowler will be allowed to claim him as an income tax deduction. He's paying the majority of the bills. He's entitled to that benefit." At the hearing, Booth was asked the following question and gave the following answer:

> Q: Do you acknowledge that all things considered, with the 40-plus weeks period that [Emily] has with Ben, that she is contributing up to 50% of his needs?
>
> A: Yes.

However, the question asked of Booth dealt with the pre-divorce situation and did not include the court's award of child support. Taking into consideration Booth's child support obligation and Benjamin's placement with Booth seventy-seven days a year, the circuit court's finding that Booth will contribute more than fifty percent of the child's support is not clearly erroneous.

Emily also argues that the child support standards, Wis. Adm. Code ch. HSS 80, anticipate that the payee

527

parent will make a financial contribution to child support "similar" to that made by the payor parent. The standards do not, however, anticipate that the payee parent will make a dollar-for-dollar contribution to child support. The child support percentage of income standards are based on the percentage of income and disposable assets that parents use to raise their children. Wis. Adm. Code ch. HSS 80 (Preface). "[The standard] determines the *percentage* of a parent's income and potential income from assets that parents should contribute toward the support of children if the family does not remain together." *Id.* (emphasis added). According to Emily's financial disclosure form, seventeen percent of her gross income would equal $587 per month, substantially less than that which Booth is required to pay under the percentage standards.

We conclude that the trial court did not abuse its discretion in awarding the income tax dependency exemption to Booth.

V.

## VALUATION OF BOOTH'S RETIREMENT FUND ACCOUNT

Emily argues that because the record does not show how the circuit court valued Booth's retirement fund account, the court's exercise of its discretion cannot be reviewed. Therefore, she argues, the valuation of Booth's account should be remanded to the trial court for further consideration.

The parties entered into a partial marital settlement agreement. Section VIII C. 2. of that agreement provides: "The property listed on Exhibit B shall remain the property of the party indicated, *and shall have the*

*value set forth for purposes of valuing the total marital estate subject to division."* (Emphasis added.) Item 13 of Exhibit B lists the value of Booth's Wisconsin retirement fund account as $80,851.

At the hearing, Emily introduced Exhibit 13 entitled "Proposed Distribution of Marital Estate." That exhibit lists Booth's retirement fund account at a value of $80,851. She was shown this exhibit by her counsel and was asked the following question and gave the following answer:

> Q:    I am going to show you finally what's been marked for identification purposes as Exhibit 13. That exhibit is entitled Proposed Distribution of Marital Estate . . ..
> *That includes the valuations upon which you would agree* and also sets forth the proposed distribution of the assets as worked out between yourself and counsel.
>
> A:    Yes. [Emphasis added.]

The circuit court found that: "The parties agree that the value of [Booth's] retirement account at the time of trial was $80,851.00."

Emily represents that the issue of pension evaluation arose subsequent to the trial and that both parties presented their valuations to the trial court. She states in her reply brief: "[The parties] agreed on the valuation, but not on how it was obtained or how it was calculated." Apparently it is Emily's position that even though the parties agreed as to the value of Booth's retirement fund account, it was necessary for the trial court to independently value that account and because it did not, it failed to exercise its discretion. Emily's counsel seems to regard the trial court as a safety net to save

him from his failure to present his case. We do not look favorably upon meritless assertions that a trial court has abused its discretion. We attempt to consider all contentions advanced by counsel and examine the record to find support for those contentions. We consider it the duty of counsel to make responsible arguments to this court. We reject Emily's contention with respect to the valuation of Booth's Wisconsin retirement fund account as irresponsible.

The court imposes respondent's costs on appellant's counsel as a sanction for the irresponsible arguments we have noted in our opinion.

*By the Court.*—Judgment affirmed in part and reversed in part with directions to the trial court to exclude from the marital estate the stock acquired by Emily in the AT&T divestiture. No costs to appellant. Respondent's costs to be paid by appellant's counsel.