IN RE the MARRIAGE OF: Miriam Mary GERRITS,
Petitioner-Respondent-Cross Appellant,†

v.

William Christian GERRITS, Respondent-Appellant-
Cross Respondent.

Court of Appeals

*No. 91–0132. Submitted on briefs December 10, 1991.—Decided
February 27, 1992.*

(Also reported in 482 N.W.2d 134.)

† Petition to review denied.

430

431

432

■

For the respondent-appellant-cross respondent the cause was submitted on the briefs of *James Grant* of *Grant & Hoeper* of Waupun and *Raymond E. Krek* of *Krek & Hue, S.C.,* of Jefferson.

For the petitioner-respondent-cross appellant the cause was submitted on the briefs of *Douglas J. Ondrasek* of *Edgarton, Ondrasek, St. Peter, Petak & Massey* of Fond du Lac.

Before Eich, C.J., Gartzke, P.J., and Dykman, J.

EICH, C.J. William Gerrits appeals and Miriam Gerrits cross-appeals from an order increasing Miriam's maintenance. Several months after the parties were divorced, William won approximately $20,000,000 in the Wisconsin lottery and Miriam moved to increase maintenance, seeking half of William's winnings. The trial court granted the motion, but limited the increase to $40,000 annually, effectively increasing William's monthly payments from the $2,000 provided in the original divorce judgment to $5,333.33.[1] Both parties appealed, William claiming that the increase was unjustified, and Miriam arguing that it was too low.

William's appeal challenges the trial court's order on several grounds. With respect to the lottery proceeds, he claims: (1) that they are property, not income, and thus cannot be used as a basis for modifying maintenance; (2) that winning the lottery cannot, by itself, meet the

---

[1]The court awarded Miriam $40,000 out of each annual lottery check received by William, in addition to the $2,000 per month originally ordered. The $40,000 translates to $3,333.33 per month which, when added to the existing $2,000, totals $5,333.33.

"changed circumstances" requirement for modification of maintenance; (3) that the trial court erred in interpreting the provisions of the judgment requiring the parties to "equalize" their incomes once certain conditions were met as specifically contemplating future lottery winnings; and (4) that the court abused its discretion when it (a) failed to explain how it arrived at the $40,000 figure or how the figure related to Miriam's needs, and (b) disallowed the testimony of one of his expert witnesses. He also argues that the trial court improperly denied his request for discovery regarding Miriam's fee arrangements with her attorney.

We conclude that the lottery proceeds may be considered a change in William's financial circumstances appropriately considered in determining whether a modification of maintenance is justified. However, because the purpose of maintenance is to permit the payee spouse to enjoy the same standard of living he or she enjoyed during the marriage, and because the trial court failed to indicate or explain in any way how the ordered increase related to that goal, it exceeded its discretionary authority in determining the amount of the increase. We therefore remand for further proceedings in this regard.

We also conclude that the trial court's statement that the parties "agreed" to split any future lottery winnings is *dicta* not binding on the parties and not necessary to consider on this appeal. Finally, we conclude that William has not shown any error in the disallowance of his witness's testimony or in the denial of his discovery request.

Miriam's cross-appeal claims first that the additional $40,000 maintenance award was too low. Because we hold that she is entitled only to maintenance at a level reasonably necessary to maintain the standard of

living she enjoyed during the marriage, and because we are remanding the case to the trial court to determine that amount, we need not consider her argument further. We reject her argument that she (and her heirs) have a "vested interest" in William's lottery winnings which survives her remarriage or death.

The facts material to this appeal are not in dispute. William and Miriam were divorced on November 28, 1989, after forty-two years of marriage. He was sixty-two, and she was sixty, at the time. The divorce judgment directed that Miriam receive maintenance[2] of $2,000 per month to continue until she reached age sixty-five and both she and William retired, at which time they agreed to "equalize" their incomes from "any and all sources."

Approximately five months after the judgment became final, William purchased a Wisconsin "Megabucks" lottery ticket and was notified a few days later that he had won a prize in excess of nineteen million dollars, to be paid to him at the rate of $984,000 annually. As indicated, upon learning of William's good fortune, Miriam moved to increase her maintenance to an amount representing half of his winnings and the court granted her motion to the extent of $40,000 per year.

## The Lottery Winnings as Income or Property

William argues first that the lottery proceeds are property, not income, and thus may not be considered by

---

[2]The judgment provided that the $2,000 be in the form of either maintenance from William, salary from an auto supply business the couple had operated for many years, social security benefits, or any combination of the three. In whatever form, the parties have treated the provision as one for maintenance.

the court in modifying the maintenance award. He likens his winnings to pension payments drawn on an account invested during the marriage, as in *Steinke v. Steinke,* 126 Wis. 2d 372, 376 N.W.2d 839 (1985), where it was held that such payments constituted assets that were part of the marital estate and thus subject to division in the divorce—or to a lawyer's accounts receivable, which we held in *Ondrasek v. Ondrasek,* 126 Wis. 2d 469, 377 N.W.2d 190 (Ct. App. 1985), should receive similar treatment.

We believe the cases are distinguishable because they both involved interests held at the time of divorce. Here, however, we are concerned with a postjudgment petition to increase maintenance on grounds that the parties' financial circumstances have changed since the divorce was granted. We are not concerned with which items may be considered part of a marital estate. There is no marital estate. It has already been divided. We are concerned only with whether William's postdivorce lottery winnings of some $900,000 per year for twenty years affect his ability to pay to his former wife an amount reasonably necessary to maintain her at the approximate standard of living she enjoyed during the marriage.[3]

 We conclude, as did the trial court, that where "a lottery award is won after the winner has been divorced, and where the lottery winnings obviously did not constitute any form of property within the marriage, [the]

___

[3]With respect to *Ondrasek,* we also note that other cases—some more recent—have held that accounts receivable may also be considered as anticipated income and thus relevant to ability to pay support or maintenance. *See,* for example, *Johnson v. Johnson,* 78 Wis. 2d 137, 143, 254 N.W.2d 198, 201 (1977); *Hubert v. Hubert,* 159 Wis. 2d 803, 811-13, 465 N.W.2d 252, 255 (Ct. App. 1990).

lottery winnings may be considered as part of the lottery winner's total financial circumstances in reviewing a maintenance award."[4]

## Change in the Parties' Circumstances

The trial court agreed with William that Miriam "ha[d] not established any substantial increase in her needs since the time of the divorce." William, citing *Harris v. Harris,* 141 Wis. 2d 569, 415 N.W.2d 586 (Ct. App. 1987), contends that such a finding precludes any modification of maintenance. He argues that a showing of increased need on Miriam's part, not just his own increased ability to pay, is a threshold requirement for any postjudgment maintenance modification. We are not persuaded.

The general rule is that maintenance will be changed only upon "a positive showing of a change of circumstances." *Taake v. Taake,* 70 Wis. 2d 115, 121, 233 N.W.2d 449, 452 (1975). The change must be "substantial," *Harris,* 141 Wis. 2d at 573, 415 N.W.2d at 588, and it "must relate to a change in the financial circumstances of the parties." *Van Gorder v. Van Gorder,* 110 Wis. 2d 188, 195, 327 N.W.2d 674, 677 (1983).

William does not dispute the general rule. Instead, he points to *Harris* as "distinctly h[olding] that [the payee's] 'need' . . . is the threshold factor for postjudg-

---

[4]William also asserts that we should "follow the other jurisdictions, where the issue has been consistently decided in favor of treating lottery winnings as property." The only out-of-state cases he cites us to, however, are a New York trial court decision, *Ullah v. Ullah,* N.Y.L.J., Nov. 8, 1988, at 24, column 3 (Superior Court, Kings County), and an Illinois case, *In re Van Zuidam,* 516 N.E.2d 331 (Ill. App. 1987), in which one spouse won the lottery *prior to* the divorce. Neither case is of any assistance here.

ment maintenance modifications." He bases that assertion—and his argument—on the following statement in *Harris:* "[The husband] does not argue that he cannot pay more, and the trial court correctly concluded that [the wife] is not entitled to more maintenance simply because [the husband] can pay it." *Id.,* 141 Wis. 2d at 579, 415 N.W.2d at 591.

William reads *Harris* too narrowly. The case does not, as William suggests, establish a bright-line requirement that any adjustment of maintenance is conditioned upon a showing of increased need on the payee's part. Rather, it discusses and continues the traditional rules governing maintenance—that its object, either when initially ordered or later revised, is to maintain the payee spouse in the financial situation enjoyed during the marriage.

Maintenance is grounded in spousal support obligations long recognized in the law: "the obligation of the supporting spouse to support the other . . . in the manner to which that spouse was accustomed during the marriage." *Van Gorder,* 110 Wis. 2d at 193, 327 N.W.2d at 677. And in *Harris*—a case, like this one, seeking modification of maintenance—we said that "[t]he purpose of any maintenance adjustment is to fulfill the objective of the original judgment, which is to maintain the dependent spouse at the standard of living enjoyed during the marriage." *Id.,* 141 Wis. 2d at 577, 415 N.W.2d at 590. *See also LaRocque v. LaRocque,* 139 Wis. 2d 23, 35, 406 N.W.2d 736, 741 (1987) (goal of maintenance is to provide support at a standard of living "comparable to the one enjoyed during the marriage"); *Tonjes v. Tonjes,* 24 Wis. 2d 120, 125, 128 N.W.2d 446, 449 (1964) (husband held to have "continuing obligation to support his wife at the social and economic status to which she had become accustomed during the mar-

riage"); *Fowler v. Fowler,* 158 Wis. 2d 508, 521, 463 N.W.2d 370, 374 (Ct. App. 1990) (goal of maintenance is "to provide support at pre-divorce standards").

As to Miriam's "needs," it is only the very rare couple who can maintain a predivorce living standard after parting. It is a common fact of postdivorce life that "[t]he increased expenses of [maintaining] separate households [after a divorce] prevent the parties from continuing at their pre-divorce standard of living [and] both parties . . . have to bear the sacrifices that the cost of an additional household imposes." *LaRocque,* 139 Wis. 2d at 35, 406 N.W.2d at 741. And it is the law that, when setting or modifying maintenance, "a court must evaluate need in the context of permitting the former spouse to live at a standard of living comparable to that enjoyed during the marriage." *Poindexter v. Poindexter,* 142 Wis. 2d 517, 534, 419 N.W.2d 223, 230 (1988), citing *LaRocque.*

This is one of those rare cases where William's good fortune will allow Miriam to maintain her former standard of living, and we agree with the trial court that William's winning the lottery is a change of circumstances sufficient to give the court jurisdiction to consider whether modification of the award is appropriate.[5]

---

[5]William also argues that the trial court erred because it based its decision almost exclusively on an inapplicable doctrine—the "fairness objective" of maintenance discussed by the supreme court in *LaRocque*—in ruling that Miriam was entitled to modification of the original award. We disagree.

Miriam had argued to the trial court that she should be entitled to fifty percent of William's lottery winnings under *LaRocque*'s "starting point" analysis: "when a couple has been married many years and achieves increased earnings, it is reasonable to consider an equal division of total income as a starting

## The Amount of the Award

The amount of maintenance to be awarded in a given case is committed to the trial court's discretion. *Fowler,* 158 Wis. 2d at 519, 463 N.W.2d at 374. A court exercises discretion when it considers the facts of record and reasons its way to a rational, legally sound conclusion. *McCleary v. State,* 49 Wis. 2d 263, 277, 182 N.W.2d

---

point in determining maintenance." *LaRocque,* 139 Wis. 2d at 39, 406 N.W.2d at 742. The trial court rejected the argument, concluding that "the *LaRocque* rationale" did not apply to a postdivorce situation where a new source of income has emerged with respect to one of the parties. While the trial court used the term "fair" (as in "fair and equitable") from time to time in its thirty-three-page decision—and stated at one point that "fairness requires that Miriam Gerrits receive some of the lottery money, [and] fairness also dictates that she is not to receive one-half of it"—we disagree with William's assertion that the "fairness objective" was "[t]he polestar on which the judge fixed his sights . . .."

To the contrary, we see the trial court as rejecting the "fairness objective" as determinative—or even applicable—to this case; and we agree. The "fairness objective" is a factor focusing on noneconomic contributions made by the spouses "during the marriage." *Hubert,* 159 Wis. 2d at 821-22, 465 N.W.2d at 259. Here, we are faced with a substantial change in circumstances of one of the parties after the divorce—the receipt of $900,000 per year for the next twenty years; it has nothing to do with contributions, economic or noneconomic, made during the marriage.

Even if the court's occasional use of the word "fair" in its decision could be considered an inappropriate application of the "fairness doctrine," any resulting error would be harmless. We have held that the court properly ruled there had been a change in the parties' financial circumstances, thus permitting consideration of a modification of maintenance, and we are remanding for reconsideration of the appropriate amount of any modification under the applicable legal principles.

512, 519 (1971). It is "a process of reasoning" in which the facts and applicable law are considered in arriving at "a conclusion based on logic and founded on proper legal standards." *Shuput v. Lauer*, 109 Wis. 2d 164, 177-78, 325 N.W.2d 321, 328 (1982).

Thus, to determine whether the trial court properly exercised its discretion in a particular matter, we look first to the court's explanation of the reasons underlying its decision. And where the record shows that the court looked to and considered the facts of the case and reasoned its way to a conclusion that is (a) one a reasonable judge could reach, and (b) consistent with applicable law,[6] we will affirm the decision even if it is not one with which we ourselves would agree. *Hartung v. Hartung*, 102 Wis. 2d 58, 66, 306 N.W.2d 16, 20-21 (1981).

It need not be a lengthy process. While reasons must be stated, they need not be exhaustive. It is enough that they indicate to the reviewing court that the trial court "undert[ook] a reasonable inquiry and examination of the facts" and "the record shows that there is a reasonable basis for the . . . court's determination." *Hedtcke v. Sentry Ins. Co.*, 109 Wis. 2d 461, 471, 326 N.W.2d 727, 732 (1982) (citation omitted). Indeed, "[b]ecause the exercise of discretion is so essential to the trial court's functioning, we generally look for reasons to sustain discretionary decisions." *Schneller v. St. Mary's Hospital*, 155 Wis. 2d 365, 374, 455 N.W.2d 250, 254 (Ct. App. 1990), *aff'd* 162 Wis. 2d 296, 470 N.W.2d 873 (1991).

[6]Where, of course, the court's exercise of discretion is based upon an error of law, it acts "beyond the limits of discretion" and its decision cannot stand. *State v. Hutnik*, 39 Wis. 2d 754, 763, 159 N.W.2d 733, 737 (1968).

The trial court, after hearing extensive evidence on the parties' pre- and postdivorce circumstances, found that the original award "did not meet [Miriam's] reasonable needs" and "did not leave [her] in a position to enjoy the same elevated standard of living as she had previously enjoyed during the marriage." Then, after stating its belief that a $500 to $1,000 increase—from $2,000 to $2,500 or $3,000 per month—would close that gap,[7] the court calculated the interest on William's annual payment at $40,000 and increased Miriam's annual maintenance by that amount. As we have noted, that effectively increased her monthly payment to $5,333.33.

As we also have noted, the underlying purpose of maintenance is to continue—to "maintain"—the payee spouse at the level and standard of living enjoyed during the marriage, or as close to that level as the circumstances of the parties will permit. But there is no recognition of that goal, and no linkage or explanation in the court's decision that would tie the ordered increase to Miriam's standard of living during the marriage. And that, as we have said, is the legal basis for any award or modification of maintenance.

We conclude, therefore, that because the court's decision departed from the purposes of maintenance as we have outlined them above, and because it did not explain how the amount it chose fit those principles, it exceeded its discretion. As a result, we reverse on this

[7]Because of the somewhat equivocal nature of the court's statement in this regard—"it . . . *appear[s]* that an additional award of $500 to $1,000.00 per month would *probably* meet those needs"—we hesitate to label it as a finding of fact having any binding effect on the determination of Miriam's predivorce standard of living on remand.

issue and remand for a redetermination of what amount, if any, over and above $2,000 per month, is reasonably necessary to maintain Miriam at the standard of living she enjoyed during her marriage to William.[8]

## The "Income-Equalizing" Provisions of the Judgment

The judgment of divorce contained a lengthy, rather confusing explanation of William's maintenance obligations. After providing for maintenance at the level of $2,000 per month, the judgment lists several "contingen-

---

[8]William suggests at one point in his brief that the parties were living at an "elevated" standard of living—living well beyond their own means—because of gifts of money and other items from William's aunt, and that if the aunt's gifts were discounted, "the divorce judgment *improved* Miriam's overall economic circumstances." (Emphasis in original.) He contradicts that suggestion at another point, however, when he acknowledges that he "chose to agree that Miriam share in the good fortune" of his aunt's gifts.

That being the case—that Miriam shared in William's aunt's largesse during the marriage—we see no reason to discount that factor in considering the standard of living she enjoyed while married to William. "The standard of living must be individualized for each case by considering the facts and circumstances of the marriage." *Hubert,* 159 Wis. 2d at 819, 465 N.W.2d at 258. "[W]here the parties had an acceptable standard of living . . . that . . . standard should be maintained if, under the facts and circumstances of the situation, such a result can be accomplished without unreasonable hardship to the supporting party." *Id.,* quoting *Bahr v. Bahr,* 107 Wis. 2d 72, 83, 318 N.W.2d 391, 397 (1982).

This is just such a case. William's aunt's contributions were used by both William and Miriam to attain a certain standard of living during the marriage, and under the circumstances of this case, that standard can be maintained for Miriam without hardship to William.

cies" the court apparently felt would "help clarify fact situations that may present themselves in the future," with respect to maintenance. The "contingency" at issue here is one stating as follows: "In the event of the double retirement of both parties, after [Miriam] has reached the age of 65 years, the income of both parties from any and all sources shall be equalized between them . . .." The judgment then defines "retirement" as the "election by the eligible party to receive Social Security benefits."

The trial court looked to excerpts from the transcript of the original divorce hearing and determined that by stipulating to the judgment, William and Miriam "agree[d]" that should either of them ever win a lottery in the future, the proceeds would be subject to the income-splitting provisions once the other stated conditions—Miriam's reaching age sixty-five and William's retirement—were met. The court went on to "find" that the couple agreed "to split even prizes won in the Wisconsin Megabucks lottery." Because, however, Miriam was not yet sixty-five and William had not retired—indeed, the court found that William had no plans to ever retire or apply for social security benefits—it made no determination as to when the income-equalization "agreement" would come into effect.

As a result, the court's statements—its "findings"—regarding the parties' "intent" with respect to application of the income-splitting provisions of the judgment to future lottery winnings, were neither addressed to any question before the court nor necessary to its decision. As such, they are *dicta;* they do not bind the parties, nor are they appropriate matters for determination on this appeal. As the trial court indicated, the provisions of the judgment stating the conditions which must be met before the splitting of any income will occur

444

are plain and unambiguous. Miriam must reach age sixty-five and William must retire and apply for social security benefits in order for the income-splitting provisions to come into play. The former has not yet occurred, and there is no certainty the latter ever will. As a result, we do not consider the issue ripe for determination.

## William's Expert Witness

William next argues that the trial court abused its discretion in refusing to consider the testimony of Dennis Mahoney, one of his expert witnesses. Mahoney, a certified public accountant, was prepared to testify that in his opinion a lottery ticket and any winnings it engendered should be considered as property and be treated as such in divorce proceedings, and that it was his further opinion that such treatment is consistent with the law of Wisconsin and other states.

The trial court disallowed the testimony because William's attorney had failed to comply with a scheduling order requiring that the reports of any expert witnesses be provided to opposing counsel two months prior to trial.

There is no question that Mahoney's report was not provided to Miriam's attorney until the morning of trial. And in its ruling the trial court emphasized the capital-letter warning on the scheduling order that it "intend[ed] to hold [counsel] to strict compliance with the terms of this . . . order" and stating that "[t]he court may bar the testimony of any witness . . . for whom a report . . . is not provided, as required above." The court also stated that it would not be fair to allow the testimony, or to admit the expert's report in evidence when it had not been provided to opposing counsel until "five minutes to 9:00 on the day of trial, when there was a Scheduling

Order that would have provided that material two months ago."

The trial court has both the inherent power and statutory authority to sanction parties for failure to comply with procedural statutes or rules and for failure to obey court orders. *See* secs. 802.10(3)(d), 805.03 and 804.12(2)(a), Stats.; *Johnson v. Allis Chalmers Corp.*, 162 Wis. 2d 261, 273-74, 470 N.W.2d 859, 863 (1991). The trial court did not exceed its discretion in ruling as it did with respect to Mahoney's testimony and report.

## William's Discovery Request

Finally, William argues that he should have been allowed discovery regarding Miriam's fee arrangements with her attorney. In his brief—which, on this point, is more invective than argument—he accuses Miriam's counsel of entering into a contingent fee contract with her in violation of the Rules of Professional Conduct for Attorneys, of "solicit[ing]" her to bring this action and of champerty. Presumably, he seeks to discover matters relating to these accusations. Indeed, because Miriam is not seeking any contribution to her attorney fees in this proceeding, it is difficult to see any other reason.

A party may obtain discovery of any matter which is not privileged and which is relevant. Section 804.01(2)(a), Stats. Because Miriam has waived any claim for attorney fees, her fee arrangement is irrelevant and the trial court properly denied William's discovery request. If William or his attorney believe—as they have represented to this court they do—that Miriam's attorney has violated the Rules of Professional Conduct or has otherwise acted improperly or unprofessionally in

this action, the proper avenue of recourse is well known to them. It is not a matter properly raised on this appeal.

## Miriam's Cross-Appeal

On her cross-appeal, Miriam argues first that the $40,000 annual increase in her maintenance award is too low. Because we have held that the maintenance to which she is entitled is that sum reasonably necessary to permit her to maintain her predivorce standard of living, and because we are remanding to the trial court to determine that amount, we need not consider her argument further.

Miriam also argues that she has a "vested interest" in William's lottery winnings which should be held to survive her remarriage and William's death—and even her own. We disagree. The right to maintenance is purely statutory; there is nothing in the applicable statutes, secs. 767.26 and 767.32, Stats., that lend any support to such a claim.

## Conclusion

We reverse that portion of the trial court's decision and order setting the sum of $40,000 per year as the amount by which Miriam's maintenance should be increased, and we remand to the trial court to determine the amount of maintenance, if any, that is reasonably necessary to maintain her at the standard of living she enjoyed during her marriage to William. As indicated, we consider the trial court's remarks about the parties' "intent" with respect to the reach of the income-splitting provisions of the divorce judgment to be nonbinding

*dicta* which we need not consider on this appeal. In all other respects, we affirm.

*By the Court.*—Order affirmed in part; reversed in part and cause remanded for further proceedings consistent with this opinion.