James J. MᴄMᴀʜᴏɴ, Individually and as Independent Administrator of the Estate of Phyllis McMahon, Plaintiffs-Appellants-Cross Respondents, †

v.

Sᴛᴀɴᴅᴀʀᴅ Bᴀɴᴋ & Tʀᴜsᴛ Cᴏᴍᴘᴀɴʏ, Defendant-Respondent,

Judy Joy Aʟᴍǫᴜɪsᴛ and George Edward Vick, Defendants-Respondents-Cross Appellants.

Court of Appeals

*No. 95–1303. Oral argument March 27, 1996.—Decided May 22, 1996.*

(Also reported in 550 N.W.2d 727.)

†Petition to review denied.

On behalf of the plaintiffs-appellants-cross respondents, there were briefs and oral argument by *Berwyn B. Braden* of *Braden & Olson* of Lake Geneva.

On behalf of the defendants-respondents-cross appellants, the cause was submitted on the briefs of *Frederic J. Brouner* and *Stephen A. DiTullio* of *DeWitt Ross & Stevens, S.C.* of Madison. There was oral argument by *Frederic J. Brouner*.

Before Anderson, P.J., Brown and Nettesheim, JJ.

BROWN, J.   In this case we address complex questions involving passive trusts, living trusts and attempted testamentary dispositions. James J. McMahon alleges that his wife set up an invalid trust four years before her death. He argues that Phyllis's trust should be characterized as an invalid testamentary

attempt because she retained complete control over the trust property even though she transferred title to the trustee. He asserts that the proper remedy is to return the title to her estate, completely vesting the trust property with her estate. Alternatively, he contends that the trust was passive because, by keeping control over the property, Phyllis did not grant any real authority to the trustee. He asserts that the remedy for this passive trust is to likewise deliver all of the trust assets to Phyllis's estate. The trust's beneficiaries, Judy Joy Almquist and George Edward Vick, who are Phyllis's children from an earlier marriage, not only contest these arguments on the merits, but have also cross-appealed primarily contending that the trust was a valid living trust.

While we affirm the circuit court's ultimate decision that the children are entitled to the trust property as the trust directs, we reach that conclusion on different grounds. Contrary to the circuit court's legal conclusion that this trust was a passive trust and that the law operated to vest the assets with the children, we hold that the trustee's duty to deliver the trust property to the children when Phyllis died made it a living trust and that this valid trust operates to deliver title to the children. Under the living trust statute, § 701.07, STATS., James's arguments about the validity of the trust must be rejected because a valid living trust cannot be declared an attempted testamentary disposition or a passive trust as a matter of law.

We have gathered the facts from the uncontested parts of the record and the stipulation that the parties filed with the circuit court. Phyllis and James married in 1956. In 1969, the couple purchased a cottage at Alta Vista Estates in Lake Geneva. Although they titled the property in Phyllis's name alone, James contends that

he contributed to the down payment and upkeep, mortgage and taxes through the years.

In 1990, Phyllis transferred the property, via a quit-claim deed, to the trust which is the subject of this case. The Standard Bank and Trust Company of Hickory Hills, Illinois, helped her form the documents and served as trustee. Under the trust agreement, Phyllis retained substantial control over the property even though she gave title to the trustee. She retained a "100% beneficial interest" and "full right of assignment." Moreover, the standard form language of the trust agreement explained that Phyllis "shall have the management of said property." At her death, however, the agreement directed that the property should pass in equal shares to her children, George and Judy.

Phyllis originally signed the trust documents on January 25, 1990. But two weeks later, Standard Bank informed her that to make the trust valid under Wisconsin law, the trustee must retain some control over the corpus. Accordingly, on February 7, 1990, Phyllis amended the trust agreement to require Standard Bank, as trustee, to supervise the payment of property taxes. Nonetheless, Phyllis was required to remit the tax bills and payments to Standard Bank and agreed to indemnify the trust company for any losses resulting from any dereliction of these duties.

In March 1993, Phyllis died intestate. Under Illinois law, James would normally be entitled to one-half interest in the Alta Vista property; the other half would be shared by George and Judy. *See* ILL. ANN. STAT. ch. 755, para. 5/2-1(a) (Smith-Hurd 1992).[1] The distribu-

---

[1] Under Wisconsin law, the validity of a will is tested by the law of the state where the will was executed. Section 853.05, STATS. Because Phyllis entered into the trust agreement in Illinois, we would apply that state's law to see if it was a valid will.

567

tion of this portion of her estate, however, was frustrated by the trust which directed that all of the Lake Geneva property be transferred to her children. Thus, in September 1993, James filed suit against Standard Bank and the children seeking to have the trust quashed.

Before we turn to the circuit court's findings, we review some of the basic principles of trust law arising in this case. A trust is a fiduciary relationship involving property. As a result of a trust, the person who holds title to the property, the trustee, has to perform duties on behalf of the beneficiaries. *See Northwestern Nat'l Ins. v. Midland Nat'l Bank*, 96 Wis. 2d 155, 172, 292 N.W.2d 591, 600 (1980) (quoting RESTATEMENT (SECOND) OF TRUSTS § 2 (1959)).

A trust has three elements: a trustee, a beneficiary and trust property. *Sutherland v. Pierner*, 249 Wis. 462, 467, 24 N.W.2d 883, 886 (1946). The person who establishes the trust is commonly referred to as the settlor. RESTATEMENT (SECOND) OF TRUSTS § 3(1) (1959).

A settlor can create a trust in two ways. First, she or he can designate in a will that the estate, or a portion of it, be placed into a trust as part of the probate process. Such trusts are known as testamentary trusts. Alternatively, a settlor can place property in a trust during her or his lifetime and possibly designate that the trust property be given to the beneficiaries at death. This arrangement is known as an inter vivos, or living, trust. *See generally* GEORGE G. BOGERT & GEORGE T. BOGERT, THE LAW OF TRUSTS & TRUSTEES § 1, at 12 (2d ed. rev. 1984). In many jurisdictions, moreover, the settlor of a living trust may make the trust revocable. Thus, a living trust can serve as a useful means of passing property to heirs without a will or probate. The settlor can effectively retain control of the trust prop-

568

erty while alive and then have the trustee deliver the property to the intended heirs at death. *See id.* § 1061, at 219.

Although living trusts and wills are separate and distinct legal forms, they share many characteristics because they both serve to pass property to heirs. Under both arrangements, the settlor (testator) will retain substantial power over the estate property during life and the ultimate transfer to the beneficiaries (heirs) will only occur at death. *See* IA AUSTIN W. SCOTT & WILLIAM F. FRATCHER, THE LAW OF TRUSTS § 57-57.1 (4th ed. 1987). Indeed, one can understand why Justice Holmes once described how living trusts may "certainly have a very testamentary look" in the much quoted case of *Bromley v. Mitchell*, 30 N.E. 83, 84 (Mass. 1892).

Nonetheless, whether living or testamentary, revocable or irrevocable, all trusts are generally subject to certain common law or statutory rules of construction. One rule which plays a role in this case is that the settlor must give the trustee a certain degree of power over the trust property. When the settlor fails to do this and leaves the trustee with no power over the property, the trust is described as passive. Most jurisdictions, including Wisconsin, have abolished passive trusts. *See* IA SCOTT & FRATCHER, *supra* § 67; *see also* § 701.03, STATS.

The flaw in a passive trust is that legal title to the trust property is controlled by a trustee who is otherwise unable to do anything with the property. When a trust is formed, the legal and equitable interests are separated: the legal title goes to the trustee and the equitable interest goes to the beneficiaries. But if the trustee is not given any duties along with the title, the beneficiaries may be harmed because the trustee has no authority to act in their best interest. *See* BOGERT &

BOGERT, *supra* § 206, at 27. We believe there are several rationales that support abolishing passive trusts. First, this awkward separation of legal and equitable interests may create practical difficulties for the beneficiaries who, for example, may want to make changes to the trust property but cannot because the title lies with the trustee. *See id.* Second, as the children explained at oral argument, passive trusts may be used to disguise the actual ownership of property. Thus, the children theorize that abolishing such trusts helps avoid potentially fraudulent or illegal activity.

The jurisdictions that abolish passive trusts also establish a remedy. These statutes are often referred to as "statutes of uses." They operate to take legal title from the passive trustee and deliver it to the beneficiaries. *See* BOGERT & BOGERT, *supra* § 206, at nn.5 & 10 (collecting authority including § 701.03, STATS.); *cf.* § 701.13(3), STATS., (permitting judicial dissolution of trusts when administration and continuation become impractical).

With these principles in hand, we will now detail the arguments brought before the circuit court. James pursued two theories. Noting that Phyllis had retained full control over the trust property, he raised the argument that this trust was an invalid testamentary attempt. He further explained that the trust agreement could not be constructively read as a valid will because it did not meet all legal requirements. For example, it was not signed before two witnesses. *See* ILL. ANN. STAT. ch. 755, para. 5/4-3(a) (Smith-Hurd 1992). Accordingly, he claimed that the trust agreement had no legal significance and title to the property should be returned to Phyllis's estate. Alternatively, he argued that the trust was an invalid passive trust under § 701.03, STATS. Since Phyllis's trustee had no

real management duties over the trust property, James claimed that the trust should be executed to vest title with the person who did have control and was the designated primary beneficiary, namely, Phyllis.

The children responded with three theories. First, under *Patton v. Patrick*, 123 Wis. 218, 101 N.W. 408 (1904), they argued that Standard Bank's property tax responsibilities were enough to make the trust "active" and not subject to the rule against passive trusts. They also counterclaimed, arguing that the trust was a valid living trust under § 701.07, STATS. Third, regardless of the definition of the trust, they claimed that the proper remedy in this case was to simply vest title with the surviving beneficiaries, namely, Judy and George.

The circuit court agreed with James's argument that the trust was passive. It rejected the children's claim that the trustee's duty to pay property taxes was enough to render the trust active. The circuit court distinguished *Patton,* which stated that giving the trustee the single duty of paying property taxes was enough to make a trust active. *See Patton*, 123 Wis. at 222, 101 N.W. at 409. The circuit court found that Phyllis's trustee had no real responsibility for paying property taxes; at most, it was just putting checks into an envelope and sending them to the county. To the contrary, the circuit court believed that the trustee in *Patton* was also required to collect payment from the leaseholders of the trust property and then use these funds to pay the property taxes. *See id*. The court reasoned that the extra duty of tracking down payment from third parties required of the *Patton* trustee presented a different situation from the subject trust because Phyllis's trustee simply had to ask her for the needed funds.

The circuit court then went forward and determined the effect of its finding. It examined the cases applying Wisconsin's passive trust statute and concluded that they established a rule that all passive trusts are abolished and the legal title goes to the beneficiary. *See Janura v. Fencl*, 261 Wis. 179, 185, 52 N.W.2d 144, 147 (1952). Because Phyllis died, the circuit court found that the remaining beneficiaries were the children. It directed that they be given title to the trust property.

James now renews the claims he made before the circuit court. He again argues that the trust was an invalid testamentary attempt, an issue which the court never reached. And while he agrees with the circuit court's conclusion that the trust was passive, he claims that it erred when it found that the remedy was to place the trust assets with the children. He argues that the proper remedy was to vest it with Phyllis because she remained the actual owner of the property at the time the invalid trust was formed. On the other side, the children attack the circuit court's legal conclusion that this trust was passive. Moreover, regardless of whether the trust was active or passive, the children contend in their cross-appeal that the trust was a valid living trust.[2]

---

[2] Since the children urge in their cross-appeal to uphold the *result* of the circuit court, they were not specifically required to file a cross-appeal. They could have simply raised their theory about the validity of the trust under the living trust statute as an argument in their brief. *See State v. Alles*, 106 Wis. 2d 368, 390, 393-94, 316 N.W.2d 378, 388, 389 (1982); *see also* DAVID L. WALTHER, PATRICIA L. GROVE & MICHAEL S. HEFFERNAN, APPELLATE PRACTICE AND PROCEDURE IN WISCONSIN § 8.3 (Feb. 1995).

The issues the parties raise require us to apply the trust agreement to the statutes governing trusts and testamentary dispositions. The interpretation of a statute is a question of law and we owe no deference to the circuit court's conclusions. *See Paul M.J. v. Dorene A.G.*, 181 Wis. 2d 304, 310, 510 N.W.2d 775, 777 (Ct. App. 1993). Moreover, while Phyllis entered into this trust with an Illinois company, the location of the trust property determines the applicable law governing the trust and we will apply Wisconsin law. *See Boyle v. Kempkin*, 243 Wis. 86, 90, 9 N.W.2d 589, 591 (1943).

We begin with the children's main argument. They contend that § 701.07, STATS., the living trust statute, dictates the outcome of this case. They argue that the plain language requires that we dismiss both of James's challenges. The statute provides in relevant part:

> **Living trusts. (1)** VALIDITY. A living trust, otherwise valid, shall not be held invalid as *an attempted testamentary disposition, a passive trust under s. 701.03*, or a trust lacking a sufficient principal because:
> (a) It contains any or all of the following powers, whether *exercisable by the settlor*, another person or both:
> . . . .
> 4. *To control the administration of the trust* in whole or in part;

Section 701.07 (children's emphasis). Under their theory, Phyllis's trust is a valid living trust because she gave the trustee the responsibility of transferring the trust property to her beneficiaries when she died. The language they cite above explains that Phyllis's decision to retain substantial power of "administration"

over the trust property until her death cannot be grounds for declaring the trust an attempted testamentary disposition or, similarly, a passive trust. *See* § 701.07(1)(a)4.

James first responds to the children's theory that the living trust statute answers whether Phyllis's trust was an invalid testamentary attempt. Although he does not dispute that the plain language of the statute could be read to dismiss his claim, he contends that case law prevents us from reaching such a result. He argues that these cases hold that a trust may indeed be deemed void as an attempted testamentary disposition if the settlor retains too much management control. We thus turn to the case law and legislative history to see what they say, and to see if they can be harmonized with the plain language of the living trust statute.

The story begins over sixty years ago with the supreme court's decision in *Warsco v. Oshkosh Sav. & Trust Co.*, 183 Wis. 156, 196 N.W. 829 (1924). There, the settlor placed a certificate of deposit in a living trust. Through the trust documents, he reserved the power to withdraw income from the account and to change trustees. At death, he directed that the balance be paid to the beneficiary, his wife. When the settlor died, the trustee paid the balance to the beneficiary according to the terms of the trust. *See id.* at 158-59, 196 N.W. at 829-30.

The settlor's estate, however, claimed that the trust was invalid. The supreme court agreed. But instead of specifically articulating whether this trust was passive or was an attempted testamentary disposition, the court looked to basic trust principles to deem the trust invalid. It focused on how the settlor had reserved "complete control of the trust property." *Id.* at 161-62, 196 N.W. at 831. In the case of a bank deposit,

574

the court explained that this settlor's power to demand "every cent" from his deposit equated to having complete control. *See id.* at 160, 196 N.W. at 830. The court further reasoned that a trust requires trust property. Hence, even though this settlor delivered title to the trustee, because he failed to relinquish actual control over the property, no trust property was present and the trust failed. *See id.* at 162, 196 N.W. at 831.

If *Warsco* were the law today, James would win. If the settlor's failure to relinquish control over the trust property is the true sign of validity, then we would hold Phyllis's trust invalid because she reserved essentially all administrative power over the trust property.

However, in 1931, the legislature enacted § 231.205, STATS., a predecessor to the current living trust statute. *See* Laws of 1931, ch. 216, § 1. While we have reproduced the entire statute at the margin,[3] the key language allowed the settlor to reserve the "right to revoke, amend, alter or modify the trust" and also withdraw sums from the trust property without risk that the trust would be declared void as an "invalid trust" or an "attempted testamentary disposition." Section 231.205, STATS., 1933. The legislature's apparent response to the *Warsco* case seems therefore to extin-

---

[3] Section 231.205, STATS., 1933, provided:

**Life use by creator of trust.** Any instrument declaring and creating a trust shall not, when otherwise valid, be held to be an invalid trust or an attempted testamentary disposition of property because the grantor or creator of the trust reserved to himself, to be exercised by him during his lifetime, the right to revoke, amend, alter or modify the trust instrument in whole or in part, or to require that sums from the trust principal be paid to or used for him either at his request or in the discretion of the trustee. Nothing in this section shall be construed as altering or changing in any way the existing law or rules of law relating to the taxation of transfers of property in trust.

guish James's claim that the plain language of the living trust statute does not apply to Phyllis's trust.

Still, supreme court cases subsequent to the first living trust statute cast some doubt over its scope. For example, in *Koppelkam v. First Wis. Trust Co.*, 240 Wis. 254, 256, 3 N.W.2d 350, 351 (1942), the estate administrator claimed that under *Warsco*, the decedent had made an invalid testamentary disposition of property because he had made his living trust revocable. The supreme court rejected this argument and held that *Warsco* did not establish "revocability" as the test for whether a living trust was valid. *See Koppelkam*, 240 Wis. at 258-59, 3 N.W.2d at 352. The court confirmed that *Warsco* instead turned on the degree of control that the settlor retained over the trust property. *See Koppelkam*, 240 Wis. at 259, 3 N.W.2d at 352.

But that estate administrator's claim that *Warsco* was about revocability exemplified the confusion that Warsco and the legislature's living trust statute created among the bar up through the 1940s. There was dispute over what *Warsco* stood for and, more importantly, what the legislature intended to do when it enacted the living trust statute in 1931. Was the first living trust statute designed only to allow a settlor to make the trust revocable, or was it also directed at the issue James raises about the settlor's attempt to retain power over the trust property? For example, in *Tucker v. Simrow*, 248 Wis. 143, 21 N.W.2d 252 (1946), the court seemed to further suggest that the living trust statute addressed only revocability because there it wrote that Warsco held that a settlor who retained "substantially entire control of the property" has attempted to make a testamentary disposition, not a living trust. *See id.* at 145, 21 N.W.2d at 252; *see also* Kathryn H. Baldwin, Comment, *Trusts—Direction and*

576

*Control Permissible—Statutory Construction*, 1943
WIS. L. REV. 127, 130-31 (arguing that *Koppelkam*
revealed that *Warsco* was still good law).

Fourteen years later, in *Otterson v. Fraser (Estate
of Steck)*, 275 Wis. 290, 81 N.W.2d 729 (1957), the
supreme court finally had the opportunity to directly
address the relationship between *Warsco* and
§ 231.205, STATS., 1933, and settle the controversy
about what the living trust statute did. Here, the court
ruled that the statute *changed* the rule of *Warsco*
regarding when a living trust would be deemed a testa-
mentary disposition. *See Otterson*, 275 Wis. at 295-96,
81 N.W.2d at 732. The statute expanded the rights of
the settlor to not only reserve the power to revoke the
living trust in whole or part, but it also permitted the
settlor to retain veto power over the trustee's decision-
making. *See id.* at 296-97, 81 N.W.2d at 732-33.

But the supreme court's conclusion that § 231.205,
STATS., 1933, allocated veto power to the settlor of a
living trust does not exactly answer James's claim.
Phyllis retained much more than veto power over the
trustee; she reserved for herself direct management
control over the trust property. The discussion in *Otter-
son* about how the living trust statute allows a settlor
to retain power over "approval or disapproval of the
trustee's recommendations" is thus only marginally
relevant to the controversy over Phyllis's trust. *See
Otterson*, 275 Wis. at 297, 81 N.W.2d at 733.

The legislature has, however, made two sets of
comprehensive amendments to the living trust statute
since the *Otterson* decision. While this case presents
the first opportunity to gauge the effect of these amend-
ments, which were enacted in 1955 and 1969, we are
confident that the newer statutory language autho-
rizes a settlor to retain much more than veto authority

without risk that the trust will be deemed void as an attempted testamentary disposition.[4]

The written history of the 1955 amendments described the concerns of the legal community over the direction of the supreme court decisions. The bar believed that a policy which strictly construed living trusts to determine if they were testamentary attempts would discourage the use of these "flexible estate planning tools." *See* Memorandum from T.L. Tolan, Jr. (of the drafting committee) to Senator Harry F. Franke, Jr., 5-6 (Sept. 15, 1954).[5] The drafters thus designed the 1955 living trust statute to have "less strict requirements than some of the cases have demanded so far as living trusts are concerned," but to still avoid the risk of "chicanery." *See id.* at 5.

Moreover, in 1969, the legislature again restructured and renumbered the living trust statute. Laws of 1969, ch. 283, § 17 (creating § 701.07, STATS.). Most important to the issue of testamentary dispositions, the legislature added language authorizing settlors of living trusts to retain the power "to control the administration of the trust in whole or in part." *See id.* (§ 701.07(1)(d)). Given the case law and legislative history leading to these amendments, we believe that the

---

[4] Although the supreme court's decision in *Otterson v. Fraser (Estate of Steck)*, 275 Wis. 290, 81 N.W.2d 729 (1957), came two years after the 1955 amendments, the court looked to the earlier 1933 statute because the 1955 amendments did not apply to trusts which were executed by people who died before its effective date. Section 231.205(5), STATS., 1957. Because the settlor in *Otterson* died in 1954, the 1955 statute did not apply. *See Otterson*, 275 Wis. at 292, 81 N.W.2d at 731.

[5] This memorandum and the other legislative history we reference in this opinion are located in the microfiche files at the State Law Library in Madison, Wisconsin.

legislature intended the 1969 changes to further embellish the settlor's power over the property placed in a living trust.

With the new changes, not only could settlors retain veto power as the earlier statutes permitted, but they could also retain full management control over the property if they desired. We reach this conclusion by placing great emphasis on the legislature's choice of the word "administration" in what became § 701.07(1)(a)4, STATS., 1971, to describe the powers that could be retained by the settlor of a living trust. As Webster's dictionary explains, "administration" means:

> **2 b:** performance of executive duties: MANAGEMENT, DIRECTION, SUPERINTENDENCE. . . **3 a:** the management and disposal under legal authority of the estate of an intestate or of a testator having no competent executor **b:** the management of an estate of a deceased person by an executor **c:** the management of an estate (as of an infant) by a trustee or guardian legally appointed to take charge of it

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 28 (1976). We believe that by using the word "administration," the legislature intended to authorize a settlor of a living trust to maintain power over the trust property equal to that normally associated with a trustee.

Accordingly, since the few amendments since 1969 have not affected this subsection of § 701.07, STATS., we conclude that James's argument about the testamentary character of Phyllis's trust fails. Even though Phyllis retained more than substantial control over the trust property, her trust remains valid. The living trust statute expressly permits a settlor to retain adminis-

trative control over the trust property and not risk having the trust declared void as an attempted testamentary disposition. *See* § 701.07(1)(a)4.

Having disposed of James's argument that the trust was an invalid testamentary attempt, we still face his alternative argument that our above conclusion about the management power granted to settlors through § 701.07, STATS., has no role in the analysis of whether Phyllis's trust was a passive trust. James contends that we cannot read the living trust statute in isolation. Although James does not argue that § 701.07 is ambiguous, he does assert that we may not construe the statute in a way which conflicts with the passive trust statute, specifically the following language:

> **Passive trusts abolished.**. . .*[E]very trust*, to the extent it is private and passive, *vests no title or power in the trustee*, but the beneficiary takes a title corresponding in extent to the beneficial interest given the beneficiary. *A trust is passive if the title or power given the trustee is merely nominal* and the creating instrument neither expressly nor by implication from its terms imposes active management duties on the trustee.

Section 701.03, STATS. (emphasis added). James contends that we cannot read the living trust statute to allow a settlor of a living trust to retain nearly full direction and control over the trust property, thereby not giving any power to the trustee. In his view, this reading would render the passive trust statute meaningless. James argues that the "every trust" language within § 701.03 applies to every trust, including living trusts. "Had the legislature intended to nullify § 701.03," James complains, "it would have been done

580

by revocation, not by the creation of a contrary provision."

So while we face no claim that § 701.07, STATS., in and of itself is ambiguous, its interrelation with § 701.03, STATS., results in disagreement about the proper interpretation of the living trust statute. *See Hurst v. State*, 72 Wis. 2d 188, 195, 240 N.W.2d 392, 397 (1976). We will therefore turn back to the history of the living trust statute. This time we will strive to harmonize it with the statutory prohibition against passive trusts. *See generally id.* at 196, 240 N.W.2d at 397.

At the outset, we observe that James's argument would have much more weight if the earlier versions of the living trust statute were still in effect. Consider how a student commentator assessed the 1955 amendments:

> In amending subsection (1) of 231.205, the legislature made the reserved powers "exercisable by the settlor or another or both." The plain meaning of this language seems to be that the powers may be reserved to the settlor, to the trustee, to the beneficiary, or to any other person. *It seems clear that the problem to which the statute is addressed is the Statute of Wills, not problems of merger or passive trusts.*

David S. Ruder, Comment, *The Testamentary Nature of Revocable Inter Vivos and Life Insurance Trusts—Liberalizing Legislation in Wisconsin,* 1956 WIS. L. REV. 313, 316 (emphasis added; author's emphasis removed; footnote omitted).

However, the amendments since 1955 have subsequently addressed the passive trust issue that the above commentator spotted and James now raises.

After the 1955 amendments, the living trust statute that the commentator discussed began as follows:

> **Life use by settlor of trusts; eligibility for bequests and devises; powers.** (1) Any instrument declaring or creating a trust, when otherwise valid, shall not be held an invalid trust, or an attempted testamentary disposition, because it contains any of the following powers, whether exercisable by the settlor or another or both:

Section 231.205, STATS., 1957. But in the 1969 amendments, the legislature reshaped the introductory section, adding specific language addressing passive trusts, when it created what is currently § 701.07, STATS.:

> LIVING TRUSTS. (1) VALIDITY. An instrument creating a living trust shall not be held invalid as an attempted testamentary disposition or *a passive trust* because it contains any or all of the following powers, whether exercisable by the settlor, another person or both . . . .

Laws of 1969, ch. 283, § 17 (emphasis added). While one might expect the legislature to redefine the passive trust statute if it wanted to create an exception for living trusts, as James argues it would, the legislature seems to have taken the alternative route. It concluded that the best way to protect people forming living trusts from challenges that they had written a passive trust was to write and place an exception into the living trust statute.

Unfortunately, we were unable to locate much commentary describing why the legislature expanded the living trust statute to protect these trusts against claims that they were passive. The only explanation

that the Legislative Reference Bureau "analysis" of 1969 Assembly Bill 653 provides is that the amendments were "a recodification of the law on trusts."

One would surmise, therefore, that we could identify a Wisconsin case prior to 1969 which states the rule that these amendments were designed to codify. But we have not found that case.

■■

We have located one treatise, however, which provides some guidance. It describes how some jurisdictions have held that a trustee's duty to transfer title of the trust property to the beneficiaries at the death of the settlor is sufficient to make the trust into an active trust, not subject to the prohibition against passive trusts. Most importantly, the authors place Wisconsin in that class. SCOTT & FRATCHER, *supra* § 69.1, at n.4. These authors specifically contend that *Boyle v. Kempkin*, 243 Wis. 86, 9 N.W.2d 589 (1943), provides such a result. We agree with their analysis and hold that *Boyle*, at least on its facts, stands for the proposition that a trustee's duty to deliver title to the beneficiaries of a trust at the death of the settlor is a sufficient duty to mark the trust as an active trust.

The settlor in *Boyle* owned real estate in Racine county. Similar to what Phyllis did, he transferred title of the property to a trust and instructed the trustee to hold the property for his benefit and then to divide the property among his beneficiaries when he died. After the settlor died, the trust beneficiaries sued the settlor's estate seeking enforcement of the trust. *See id.* at 88-89, 9 N.W.2d at 591.

While the supreme court acknowledged that "no active duties were given to the trustee to perform," it held that the passive trust statute only operated to execute the use for the *period* of the settlor's life. *See id.*

at 90, 9 N.W.2d at 591. It further explained that title was left with the trustee to the extent necessary to enable him to perform its specified duties. Thus, the court determined that the trustee in *Boyle* retained enough title to enable it to transfer whatever remained of the trust property when the settlor died. *See id.* at 90-91, 9 N.W.2d at 591-92.

In the same section of this treatise, the authors cite a case from the South Carolina Court of Appeals which provides a more thorough explanation of the relationship between the passive trust rules and living trusts. *See* SCOTT & FRATCHER, *supra* § 69.1, at n.4. While that case was decided after the 1969 amendments, we find the South Carolina court's reasoning equally descriptive and persuasive.

In *Ramage v. Ramage*, 322 S.E.2d 22 (S.C. Ct. App. 1984), the settlor deeded her property to two of her nephews in trust. Their only duty was to transfer the property back to her estate once she died. The purpose of this arrangement was to protect the settlor from the pressure of other relatives asking her to sell them land. *Id.* at 24-25.

After the settlor died, the nephews refused to carry out their duties as trustees. They argued that the trust was passive and invalid under South Carolina's Statute of Uses. See *id.* at 26 (citing S.C. CODE ANN. § 21-27-20 (Law. Co-op. 1976), *amended*, § 62-7-107 (Law. Co-op. 1987)). The court of appeals, however, concluded that the Statute of Uses did not apply because these trustees did have a duty. They were required to hold the property until the settlor died and then transfer it back to her estate. *See Ramage*, 322 S.E.2d at 26.

The Wisconsin Supreme Court's analysis in *Boyle* together with the South Carolina Court of Appeals' analysis in *Ramage* suggest that a statute abolishing

passive trusts cannot completely abolish a living trust even when the settlor grants no duty to the trustee that would be performed during his or her lifetime. This was the rule that the living trust statute seemingly codified. Where § 701.07, STATS., states that a living trust cannot be deemed a passive trust because the settlor has retained (and thus not granted to the trustee) administrative control over the trust property, it is expressing the conclusion reached by the *Boyle* and *Ramage* courts.

Our conclusion that the passive trust statute does not apply to living trusts nonetheless leaves us with James's concern that such an interpretation effectively guts the passive trust statute. In fact, we still have not addressed the circuit court's conclusion that Phyllis's trust was a passive trust under *Patton*, 123 Wis. at 222, 101 N.W. at 409, because Phyllis did not give the trustee any real authority over the property.

We are confident, however, that our analysis is soundly grounded in the legislative history and interpretive case law. The legislature apparently has concluded that the problems which the passive trust statute is targeted at, such as potential impracticality of the trust or possible fraud, are not significant concerns in the context of living trusts.

Moreover, our discussion about the living trust statute reveals that the *Patton* decision is not at all relevant to a determination of whether Phyllis's trust is a valid living trust. The trust in *Patton* was a testamentary trust. The trust was formed only after the settlor died. *See id.* at 219, 101 N.W. at 408. This is a key factor because whether the settlor is still alive is the hallmark of the living trust. Quite simply, when the settlor is alive, the trustee in a living trust has the duty to stand by in case the settlor dies. This duty to wait is

the active duty that the *Boyle* and *Ramage* decisions focus on.

So, while our holding somewhat curtails the passive trust statute, it by no means renders this statute meaningless because it will still be a factor in determining the validity of other types of trusts.

In conclusion, the living trust statute, § 701.07, STATS., controls this case. Under it, we must reject James's claims that this trust was invalid as either an attempted testamentary disposition or as a passive trust because Phyllis retained complete control over the property. In accord with the terms of the trust, Phyllis's children are entitled to the property. We therefore affirm the circuit court's ultimate determination that title be given to the children, not to Phyllis's estate.

*By the Court.*—Judgment affirmed.