Elmer W. Glaeske, as Trustee of the Irrevocable Trust of Arthur Shaw, Plaintiff-Respondent,

v.

Elwyn M. Shaw, Defendant-Appellant,†

William Shaw, Defendant-Respondent.

Court of Appeals

*No. 01–3056. Submitted on briefs August 9, 2002.—Decided February 6, 2003.*

2003 WI App 71

(Also reported in 661 N.W.2d 420.)

† Petition for review dismissed 4-7-03.

549

552

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Gary M. May*, Monona.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Anthony R. Varda* of *DeWitt Ross & Stevens, S.C.*, Madison.

On behalf of the defendant-respondent, the cause was submitted on the brief of *Paul S. Curran* of *Curran, Hollenbeck & Orton, S.C.*, Mauston.

Before Vergeront, P.J., Dykman and Deininger, JJ.

¶ 1. DEININGER, J. Elwyn Shaw appeals a judgment upholding the validity of a trust. He claims the trial court erred when it: (1) dismissed his claim that William Shaw unduly influenced Elwyn's father, Arthur Shaw, to designate William as the primary beneficiary of the irrevocable trust; (2) denied his motion to invalidate the trust for improper execution; (3) struck his expert witnesses; (4) refused to join Elwyn's son, Nate, as a party to the lawsuit; and (5) stated that "it appears . . . that there is going to be some imposition of sanctions."

¶ 2. We conclude that Elwyn has pointed to no disputes of material fact or errors of law that would

preclude the entry of summary judgment against him on the undue influence claim. We further conclude that the trial court did not err in denying Elwyn's motion to invalidate the trust for improper execution, striking his expert witnesses, and refusing to join his son as a party to the lawsuit. Finally, we conclude that the trial court made no final order regarding frivolousness sanctions, and we remand for further proceedings on the issue.

## BACKGROUND

¶ 3. The trustee of the Arthur Shaw Irrevocable Trust commenced this declaratory judgment action to obtain a determination of the validity of the trust. The settlor of the trust, Arthur Shaw, died a resident of Florida. Arthur had moved to Florida from Wisconsin several years before his death, returning to Wisconsin during the summer months.

¶ 4. Arthur had one child, Elwyn Shaw. Arthur and Elwyn had a strained relationship, stemming from what Arthur deemed to be Elwyn's failure to provide a sufficient level of care for Arthur's wife (Elwyn's mother) prior to her death in the late 1980s. Arthur's neighbors, his estate planner, and the trustee of the challenged trust testified at depositions that Arthur was disappointed with his son and did not want him to inherit his estate.

¶ 5. Arthur developed a relatively close relationship with a nephew, William Shaw, following William's donation of a kidney to his father, Arthur's brother. During the last years of Arthur's life, William, a Wisconsin resident, kept in telephone contact with Arthur, saw him two or three times per year, and on at least one occasion, drove him from Florida to his Wisconsin summer residence. During this time, Arthur gave vari-

ous gifts to William and his children and gave William his power of attorney for health care matters.

¶ 6. In the decade before his death, Arthur executed several trusts, each superceding the previous one. One named Elwyn as the primary beneficiary; a later trust named Elwyn's son, Nate, as the primary beneficiary; and a still later trust named William as the primary beneficiary. In his next and final trust, Arthur retained William as the primary beneficiary and added a provision stating that he "specifically makes no provisions for [Elwyn] . . . for reasons best known to [Elwyn]."

¶ 7. Arthur executed the final trust document in Wisconsin at the offices of its drafter, his long-time estate planning counsel. The trust names a Wisconsin resident trustee and provides that "[t]he situs[1] of this Trust shall, at all times, be in the State of Wisconsin." The trust also declares that it "shall be construed according to the laws of the State of Wisconsin."

¶ 8. Following his father's death, Elwyn retained counsel to challenge the validity of the trust. Elwyn's counsel filed a "Motion to Freeze" the distribution of trust assets in the Florida probate court where Arthur's estate was being administered. The motion alleged that William unduly influenced Arthur and that the trust did not comply with the requirement under Florida law that two witnesses sign in the presence of each other and the settlor at the time of the execution of a trust. *See* Fla. Stat. §§ 737.111(1), 732.502 (1)(b), (c) (2002).

---

[1] The "situs" of a trust refers to the "place of performance of active duties of [the] trustee." Black's Law Dictionary 1387 (6th ed. 1990).

Elwyn's counsel also threatened to file a lawsuit in Florida civil court on the same grounds.[2]

¶ 9. The trustee responded by filing this declaratory judgment action in Wisconsin, seeking a determination of, among other things, "the legal validity of said Trust and its Trust instrument." The complaint named Elwyn and William as defendants. Elwyn answered, raising as an affirmative defense the claim that the trust "was procured by undue influence." Elwyn also filed a motion to invalidate the trust, which alleged that because the trust was not "properly executed, the purported Trust assets actually belong to the Florida probate estate . . . ."

¶ 10. After the filing of the initial pleadings, the trial court held a scheduling conference at which it established two deadlines relevant to this appeal. The first deadline set the date by which Elwyn was to identify his expert witnesses and disclose either a formal report of their opinions or a summary of their expected testimony. The second deadline set the date by which Elwyn was required to join any additional parties to the lawsuit. The court imposed a relatively short deadline to join additional parties (30 days from the date of the scheduling conference), deeming a longer time unnecessary and contrary to the efficient progression of the lawsuit.

¶ 11. Shortly after the expert disclosure deadline, Elwyn filed his "Expert Witness List." The list contained the names of approximately sixty experts, six of whom he described as "expert witnesses retained or to be

---

[2] The record indicates that Elwyn's counsel filed such a lawsuit, but that it was dismissed based on the outcome of this action, and Elwyn elected not to appeal the dismissal. The record does not reflect the disposition of the probate court motion.

retained for this action." Elwyn summarized the various opinions that these primary witnesses purportedly held, but qualified them as opinions that "may likely be obtained" or were "expected'... once a report is prepared." Elwyn then identified over fifty additional "fact witnesses with expert credentials" who "might at some time give an expert opinion" relating to Arthur's "mental or physical condition or medical treatment." These additional witnesses included a vast array of medical personnel, including physicians, nurses, and entire medical centers.

¶ 12. Counsel for the trustee subpoenaed four of the primary witnesses for deposition. Three responded by informing counsel that they had not been retained and had not formulated any opinions concerning the case; the fourth responded by stating that he would not appear for deposition without advance payment of expert witness fees.

¶ 13. Counsel for the trustee and for William objected to Elwyn's "Expert Witness List" on the grounds that it failed to comply with the trial court's scheduling order. The court entered an order which prohibited the six primary witnesses "from testifying in any capacity in these proceedings" and prohibited the remainder of the listed witnesses "from offering any professional opinions in this proceeding."

¶ 14. Shortly after filing the "Expert Witness List," Elwyn's counsel made two attempts to join Elwyn's son, Nate, as a party to the lawsuit. Counsel first filed a "Motion to Add Party" on Elwyn's behalf, in which he claimed that Nate was a necessary party because he was the "named beneficiary" of the trust "immediately preceding" the challenged trust. Counsel subsequently filed a "Motion for Leave to Intervene" on Nate's behalf, claiming that Nate was a necessary party

559

for the reason alleged in the previous motion. Both motions were filed well after the expiration of the court's deadline for joining additional parties. The trial court denied both motions as untimely.

¶ 15. The court also denied Elwyn's motion to invalidate the trust for improper execution, concluding that Wisconsin law governs the validity of the trust, making witness signatures unnecessary. The trial court also granted summary judgment dismissing Elwyn's undue influence claim. The court entered a written order stating that Elwyn's "affirmative defense alleging that the trust at issue in this action was procured by undue influence is hereby denied, on the merits, with prejudice and with costs."[3]

¶ 16. Counsel for William and the trustee then moved for sanctions against Elwyn and his counsel on two grounds: (1) the alleged frivolousness of Elwyn's undue influence claim; and (2) Elwyn's failure to comply with the scheduling order regarding the disclosure of his expert witnesses. The court stated at the conclusion of the sanctions hearing that "it appears . . . that there is going to be some imposition of sanctions." The appealed judgment, however, leaves the "matter of sanctions . . . open and subject to further order of the court."

¶ 17. Elwyn appeals, citing as error the trial court's denial of his motion to invalidate the trust for improper execution, the dismissal of his undue influence claim on summary judgment, the striking of his expert witnesses, and the court's refusal to join Nate as a party. Elwyn also attempts to appeal the trial court's statement regarding the likely imposition of sanctions.

---

[3] The record does not contain a transcript of the summary judgment hearing.

## DISCUSSION

### I.

¶ 18. As an initial matter, we address William's contention in his response brief that Elwyn lacks standing to pursue this appeal. William contends that granting Elwyn's request to void the trust would merely "revive" Arthur's immediately preceding trust. Because William is also the primary beneficiary of that trust, William claims that Elwyn "would still receive nothing" even if he were to prevail in setting aside the challenged trust. Thus, in William's view, Elwyn lacks a "personal stake in the outcome of this case" and, correspondingly, "standing to pursue it."

¶ 19. "We may decline to review issues inadequately briefed." *State v. Pettit*, 171 Wis. 2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992). We decline to decide William's lack-of-standing claim because he cites no authority for the premise on which it rests: that the invalidation of Arthur's final trust would trigger a revival of the immediately preceding trust, instead of resulting in the distribution of the intended trust assets to Arthur's heir (i.e., Elwyn). We will therefore assume without deciding that Elwyn has standing to pursue this appeal.

### II.

¶ 20. We next address the parties' dispute concerning whether Florida or Wisconsin law controls the required formalities for execution of the trust at issue. Elwyn moved the trial court to invalidate the trust for improper execution, arguing that because the trust was not "properly executed" under Florida law, "the pur-

ported Trust assets actually belong to the Florida probate estate." Because the trial court treated this motion as one for summary judgment, we review de novo the trial court's action on the motion. *See Waters v. United States Fid. & Guar. Co.*, 124 Wis. 2d 275, 278, 369 N.W.2d 755 (Ct. App. 1985) (We review a trial court's grant or denial of summary judgment de novo, owing no deference to the trial court's decision.).

¶ 21. Florida law requires two witnesses to sign in the presence of each other and the settlor at the time of the execution of a trust. *See* FLA. STAT. §§ 737.111(1), 732.502(1)(b), (c) (2002). Wisconsin law imposes no similar requirement. The trust lacks witness signatures, and it was thus validly executed under Wisconsin law but not under Florida law.[4] Because an outcome-determinative issue exists, we must engage in a choice of law analysis. *See Lichter v. Fritsch*, 77 Wis. 2d 178, 182, 252 N.W.2d 360 (1977) (The first step in a choice of law analysis is to determine whether the choice of one law over another will affect the outcome.).[5]

---

[4] William argues on appeal that the trust complies with Florida law because the trustee and a notary signed the trust at the same time Arthur did. We note, however, that William essentially conceded in the trial court that the trust lacked the witness signatures required under Florida law. At the hearing on Elwyn's motion to invalidate the trust for improper execution, the court stated that "[a]s noted in the motion, and not seriously disputed, the trust at issue was not executed with the same formalities as required under Florida law. And most specifically, it . . . was not signed by witnesses." William's counsel did not object to this statement. Because we conclude, as did the trial court, that Wisconsin law applies, we do not address whether the trust's execution might also be deemed acceptable under Florida law.

[5] Both parties assert that a choice of law analysis is not required due to single, allegedly dispositive facts. William

¶ 22. Wisconsin courts employ two choices of law methodologies. The first, applied in contract cases,

asserts that Wisconsin law must govern because the trust states that it "shall be construed according to the laws of the State of Wisconsin." Elwyn, on the other hand, asserts that Florida law governs because Arthur was domiciled in Florida at his death. We conclude, however, that neither Arthur's designation of law in the trust nor his domicile at death is dispositive because focusing on either fact in isolation might result in the application of the law of a state that lacks a material connection to the trust. *Cf.* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 270(a) (1971) (providing that the settlor's designation of state law to govern the validity of a trust holding non-real estate assets is controlling only if the state "has a substantial relation to the trust" and the designated law does not violate a strong public policy of the state with which the trust has "its most significant relationship"); *see also id.* at § 270(b) cmt. c (providing that absent a designation of law by the settlor to govern the validity of the trust, the domicile of the settlor is one of several factors used in determining the governing law).

We also note that we are unable to resolve the choice of law issue based solely on the location of the trust assets. The location of trust property is an important (and, in the case of trusts holding real estate, dispositive) factor in the choice of law applicable to a trust. *Cf. id.* at § 270 cmt. b (listing the location of non-real estate trust assets as a relevant factor in determining whether to effect a settlor's designation of law to govern the validity of a trust); *McMahon v. Standard Bank & Trust Co.*, 202 Wis. 2d 564, 573, 550 N.W.2d 727 (Ct. App. 1996) (A trust funded with real estate must be governed by the law of the location of the real estate.). The record contains an affidavit from the trustee stating that the trust assets "include" checking and brokerage accounts. The record, however, also reflects some uncertainty concerning the identity of the trust's assets. The trustee requested in the complaint that the court determine "what real and personal property are the corpus of said Trust," but the trial court apparently never made such a determination.

provides that contract rights are to be " 'determined by the law of the [jurisdiction] with which the contract has its most significant relationship.' " *See State Farm Mut. Auto. Ins. Co. v. Gillette*, 2002 WI 31, ¶ 26, 251 Wis. 2d 561, 641 N.W.2d 662 (citation omitted). The second, applicable to tort cases, begins with a presumption that the law of the forum applies unless " 'nonforum contacts are of the greater significance,' " and ends with an analysis of five "choice influencing factors": predictability of results, maintenance of interstate and international order, simplification of the judicial task, advancement of the forum's governmental interests, and application of the better rule of law. *See id.*, ¶¶ 51, 53 (citation omitted).

¶ 23. The difficulty here is that the alleged invalidity of a trust is neither a tort claim nor strictly a contract issue. Although it might conceivably give rise to a claim of professional negligence, the improper execution of a trust does not in and of itself constitute an actionable tort. A trust document is also not generally considered to be a contract.[6] Nevertheless, we conclude that the question of whether the trust was validly executed, thereby requiring the trustee to act in accordance with its terms, appears more analogous to a contract dispute than to a tort claim. We will thus apply

Because we lack any clear evidence or findings regarding the assets of the trust, we do not consider them as a factor in our analysis.

[6] *See* RESTATEMENT (SECOND) OF TRUSTS § 197 cmt. b (1959). ("The creation of a trust is conceived of as a conveyance of the beneficial interest in the trust property rather than as a contract.").

the choice of law methodology employed in Wisconsin for contract cases. That is, we will apply the law of the state with which the trust has its "most significant relationship." *See id.*, ¶ 26.

¶ 24. We conclude that the trust at issue has its "most significant relationship" with Wisconsin, not Florida. The trust specifies that it "shall be construed" according to Wisconsin law, designates Wisconsin as the location of the trust situs, names Wisconsin residents as trustee and primary beneficiary, and identifies Wisconsin as the place of its drafting and execution. Conversely, Florida's only connection with the trust is that it is the state of Arthur's domicile at the time of his death.[7] We conclude, therefore, that Wisconsin law should govern the issue of whether Arthur complied with the formalities necessary for the creation of a trust. Because Wisconsin law does not require that two witnesses sign in the presence of each other and the settlor at the time of the execution, we conclude that the trust was validly executed.[8]

---

[7] On the significance of the settlor's domicile to a choice of law issue relating to a trust's validity, one authority states:

> It cannot . . . be stated as a rule of law that the validity of an inter vivos trust of movables is determined by the law of the state in which the settlor was domiciled at the time of the creation of the trust. The domicil of the settlor is only one of the factors to be considered in determining the validity of the trust . . . . The domicil of the settlor plays no such important part as is played by the domicil of a testator in disposing of his property by will.

VA WILLIAM F. FRATCHER, SCOTT ON TRUSTS § 597 (4th ed. 1989).

[8] As we have noted (see footnote 4), although no "witnesses" signed the trust document at the time Arthur executed it, the document does bear the contemporaneous signatures of the

¶ 25. Elwyn argues, however, that the application of Wisconsin law disregards the tenets of "basic Federalism," which he claims require "[s]ome modicum of regard for the law of other States." Elwyn further contends that the application of Wisconsin law violates principles of "comity" by allowing Elwyn to avoid Florida trust formalities and to illegally "shelter [Arthur's] assets from [M]edicaid."[9] We reject these contentions. Although we do not doubt that the trust execution formalities Florida requires serve legitimate policy goals of that state, we find it difficult to discern what interest Florida might have in applying its law to a trust that is predominantly connected to Wisconsin and minimally connected to Florida. Additionally, if the trust's provisions violate applicable Medicaid laws, as Elwyn alleges (an issue we do *not* decide), that claim must be raised by the entity responsible for determining Medicaid eligibility and recouping wrongfully paid benefits, not by a disappointed heir. Elwyn's policy arguments simply do not persuade us that Florida law rather than Wisconsin law should apply to execution of the trust at issue.[10]

trustee and a notary. Elwyn makes no claim that Arthur's signature on the trust document is not genuine.

[9] Elwyn also argues that the trust violates Florida law through its inclusion of a "penalty" if he "contests the Trust going to William." Because the trust contains no such provision, we reject this argument. (It appears that a will executed by Arthur may have contained such a provision.)

[10] Elwyn asserts that upholding the validity of the trust by applying Wisconsin law "effectively creates Wisconsin as a jurisdiction whereby decedents can deliberately bypass the law of their jurisdiction of domicile," likening the circumstances to "a quickie Mexican or Nevada divorce" or "an offshore tax haven." We reject the assertion. This is not a case where a

## III.

¶ 26. Having concluded the trust was validly executed, we next consider Elwyn's claim that it was procured by William's undue influence over Arthur. The trial court dismissed Elwyn's undue influence claim on summary judgment. As we have noted, we review a trial court's grant or denial of summary judgment de novo, owing no deference to the trial court's decision. *Waters*, 124 Wis. 2d at 278. "[S]ummary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *M&I First Nat'l Bank v. Episcopal Homes Mgmt., Inc.*, 195 Wis. 2d 485, 497, 536 N.W.2d 175 (Ct. App. 1995); WIS. STAT. § 802.08(2) (1999–2000).[11] We will reverse a decision granting summary judgment if either (1) the trial court decided legal issues incorrectly, or (2) material facts are in dispute. *Coopman v. State Farm Fire & Cas. Co.*, 179 Wis. 2d 548, 555, 508 N.W.2d 610 (Ct. App. 1993). In our review, we, like the trial court, are prohibited from deciding issues of fact; our inquiry is limited to a determination of whether a factual issue exists. *Id.*

¶ 27. To prove undue influence, Elwyn must prove Arthur's susceptibility to undue influence, to-

settlor or his trust had no relationship with the state of execution save the execution itself. In addition to the ties to Wisconsin noted in the text, we note that Arthur was previously a Wisconsin resident and returned here regularly, and that predecessors of the trust at issue had apparently included among their assets both Wisconsin real estate and a vendor's interest in a Wisconsin land contract.

[11] All references to the Wisconsin Statutes are to the 1999–2000 version unless otherwise noted.

gether with William's opportunity and disposition to influence, and the achievement of a coveted result. *See Hoeft v. Friedli*, 164 Wis. 2d 178, 185, 473 N.W.2d 604 (Ct. App. 1991). In the alternative, Elwyn could show that a confidential or fiduciary relationship existed between Arthur and William, and that there were suspicious circumstances surrounding the creation of the trust.[12] *See id*. at 184. We will examine whether the record provides support for Elwyn's claim under either of these tests, beginning with the four-element test.[13]

¶ 28. The first element, susceptibility to undue influence, involves a consideration of such facts as the person's age, personality, physical and mental health, and ability to handle business affairs. *Lee v. Kamesar*, 81 Wis. 2d 151, 159, 259 N.W.2d 733 (1977). If the record presents the possibility that a judge or jury could find that Arthur was "unusually receptive to the suggestions of others and consistently deferred to them on matters of utmost personal importance," then Elwyn's claim must survive summary judgment on the first

[12] Although Wisconsin courts typically apply the cited tests for undue influence in determining whether a will was the result of undue influence, courts have also applied the tests in other contexts. *See, e.g., Casper v. McDowell*, 58 Wis. 2d 82, 90, 205 N.W.2d 753 (1973) (applying undue influence test in determining whether to set aside inter vivos transfers). We discern no reason why these tests should not also govern Elwyn's challenge to the trust at issue here.

[13] We are not certain which of the two undue influence tests Elwyn believes finds support in the record. The record does not contain the transcript of the summary judgment hearing, and his briefs to the court are not entirely clear on the matter.

element. *Johnson v. Merta*, 95 Wis. 2d 141, 156–57, 289 N.W.2d 813 (1980). We conclude, however, that the record does not do so.

¶ 29. The record contains ample evidence tending to show that Arthur was mentally agile and strong-willed until his death. For example, the trustee, Arthur's accountant of twenty years, testified at deposition that Arthur made "sound decisions" and was "very independent" concerning his finances until his death. Arthur's estate planner of twelve years described Arthur as a man who "knew what he wanted" and who was "quite forceful in saying this is what I want and this is what I want you to give to me." Arthur's long-time neighbors testified that Arthur was "[s]harp as a tack" and that they never noticed any decline in his mental acuity. Finally, Elwyn admitted at deposition that his father was "strong willed" and that his "stubbornness became much more pronounced toward the end of his life."

¶ 30. Elwyn attempts to counter this evidence by arguing that Arthur was mentally impaired and that his numerous trust revisions demonstrate a vacillating character. Neither claim finds support in the record. Elwyn submitted no expert medical testimony in support of his allegation of Arthur's mental impairment, and the lay witness testimony uniformly indicates that Arthur was of sound and independent mind until his death. Further, although Arthur revised his estate plan several times in the decade before his death, he had designated William as his primary beneficiary in documents that were in effect for at least several years before his death, thereby undermining Elwyn's allegation that Arthur was of a vacillating character, or that the final trust in William's favor was an impulsive or irrational act on Arthur's part.

569

¶ 31. We thus conclude that the record on summary judgment does not establish a factual dispute relating to Arthur's susceptibility to influence. On the record before us, there is only one reasonable inference —that Arthur was not susceptible to any influence William might have endeavored to apply. Because Elwyn had the burden to prove all four elements (or, for present purposes, to establish that a factual dispute exists with respect to each element), his failure to meet his burden on the first element entitles William to summary judgment on the undue influence claim. *See Physicians Plus Ins. Corp. v. Midwest Mut. Ins. Co.*, 2001 WI App 148, ¶ 48, 246 Wis. 2d 933, 632 N.W.2d 59 (Summary judgment opponent may not rely on conjecture; rather, the "opponent's obligation is to counter with evidentiary materials demonstrating there is a dispute . . . ."), *aff'd*, 2002 WI 80, 254 Wis. 2d 77, 646 N.W.2d 777; *Transportation Ins. Co., Inc. v. Hunzinger Constr. Co.*, 179 Wis. 2d 281, 291–92, 507 N.W.2d 136 (Ct. App. 1993) ("[O]nce sufficient time for discovery has passed, it is the burden of the party asserting a claim on which it bears the burden of proof at trial 'to make a showing sufficient to establish the existence of an element essential to that party's case.' " (citation omitted)).

¶ 32. We turn next to the question of whether the record would permit Elwyn's undue influence claim to survive summary judgment on the alternative, two-element test for undue influence. The first element of this test is the existence of a fiduciary or confidential relationship. The record contains no evidence from which one might conclude that either type of relationship existed between Arthur and William. Although

Arthur executed a power of attorney designating Elwyn as his agent for health care decisions, the medical power of attorney did not create a fiduciary relationship between the two concerning Arthur's financial or estate planning matters. *See First Nat'l Bank v. Wernhart*, 204 Wis. 2d 361, 370, 555 N.W.2d 819 (Ct. App. 1996) (An agent is a fiduciary only with respect to matters within the scope of his agency.).

¶ 33. Neither did William and Arthur share a confidential relationship, which exists only if the favored beneficiary " 'can dictate the contents and control or influence the drafting' " of the will. *Rahr v. East Wisconsin Tr. Co.*, 88 Wis. 2d 199, 220, 277 N.W.2d 143 (1979) (citation omitted). Elwyn admitted at deposition that he did not know if Arthur sought advice from William on financial or other confidential matters, and that he (Elwyn) had no knowledge of any activities by William to attempt to affect the content of the trust. Similarly, Arthur's estate planning counsel denied having any reason to believe that Arthur was acting under any kind of undue influence at the time he executed his final trust. Thus, Elwyn has failed to demonstrate the presence of a factual dispute concerning the existence of a "fiduciary or confidential relationship," and his claim cannot survive summary judgment under the alternative test for undue influence.

¶ 34. Given that Elwyn failed to submit evidence that would establish or place in dispute required elements under both tests for establishing undue influence in Wisconsin, we conclude that the trial court did not err in dismissing his undue influence claim.

IV.

¶ 35. We next address Elwyn's claim that the trial court erred in striking his expert witnesses. On the deadline set by the trial court to disclose expert witnesses and their opinions or summaries of their expected testimony, Elwyn filed a list containing the names of six primary expert witnesses and over fifty "fact witnesses with expert credentials" who "might at some time give an expert opinion." Attempts by the trustee to depose Elwyn's primary witnesses revealed that they had not been formally retained, had not formulated any opinions concerning the case, or would not testify absent advance payment of expert witness fees. On motions from William and the trustee, the trial court entered an order prohibiting the six primary witnesses "from testifying in any capacity in these proceedings" and prohibiting the remainder of the listed witnesses "from offering any professional opinions in this proceeding." We review this order under an abuse of discretion standard. *See Gerrits v. Gerrits*, 167 Wis. 2d 429, 446, 482 N.W.2d 134 (Ct. App. 1992).

¶ 36. The trial court has both statutory and inherent power to punish a party for failing to comply with a pretrial order to disclose expert witnesses. Under Wis. Stat. § 802.10(7), a court may in response to a violation of a scheduling order: (1) impose an "appropriate sanction" if an attorney signed a frivolous document in an attempt to comply with the scheduling order (*see* Wis. Stat. § 802.05(1)(a)); and (2) make "such orders . . . as are just" (*see* Wis. Stat. § 805.03), including "prohibiting the disobedient party from introducing designated matters in evidence" (*see* Wis. Stat.

572

§ 804.12(2)(a)2). Additionally, the court has "inherent power" to punish a party for failing to comply with a pretrial order to disclose expert witnesses, including barring the party from presenting the expert evidence. *See State v. Ronald L.M.*, 185 Wis. 2d 452, 461, 518 N.W.2d 270 (Ct. App. 1994).

■

¶ 37. Elwyn argues that the trial court erred in striking his expert witnesses because he "complied to the letter" with the trial court's order and because the trial court premised its sanction on "unexpressed requirements." Elwyn further argues that the trial court failed to consider the unfairness of opposing counsel's prompt issuance of subpoenas to his listed witnesses and the inequity of the court's requirement that he disclose his expert witnesses prior to the close of discovery. We conclude that these arguments are unpersuasive, if not disingenuous.

¶ 38. At the scheduling conference, the following discussion took place:

> THE COURT: All right. May 1st, you'll identify your experts. And it will include . . . any opinion evidence that the expert is going to give at trial or a summary of . . . his or her testimony.
>
> [COUNSEL FOR ELWYN]: Okay.
>
> . . . .
>
> [COUNSEL FOR TRUSTEE]: Your Honor, just because I've run into this confusion . . . recently in a case, I assume then that on May 1st that his witness should be prepared for discovery and should have opinions that they can give if their deposition occurs shortly thereafter.
>
> THE COURT: That's why I'm requiring that the designation be accompanied by a report or opinion or a

summary of the testimony, because simply identifying an expert is of no benefit. And if it's not accompanied by a report, an opinion or a summary, then they have no opinion that's going to be admitted in this court.

Consistent with this discussion, the trial court's written order required Elwyn to "identify his expert witnesses . . . and . . . include any opinion provided by such expert or a summary of what the expert is expected to testify to at trial. Any material opinions not included in this disclosure will not be admitted at trial."

¶ 39. By any measure, Elwyn's "Expert Witness List" failed to comply with the trial court's oral and written orders. Although Elwyn identified six primary witnesses, he equivocated on whether they in fact had been retained (identifying them as experts "retained or to be retained for this action"), and on the opinions they supposedly held (stating that some of the experts "believe that expert opinions helpful to Elwyn's case may likely be obtained" and that others "expected" to have favorable opinions "once a report is prepared."). Elwyn apparently had ample reason to equivocate: when subpoenaed for deposition, none of the expert witnesses were ready or willing to testify. As for the over fifty "fact witnesses with expert credentials . . . who might at some time give an expert opinion," Elwyn's court-mandated summary of their expected testimony consisted only of the following: "[A]ny opinion would relate to the mental or physical condition or medical treatment of Arthur Shaw."

¶ 40. Given the clarity of the trial court's oral and written orders, Elwyn's unfocused "Expert Witness List," and the lack of preparedness of the named witnesses, we reject Elwyn's claims that he had "complied to the letter with the Judge's order" or that he was victimized by the court's "unexpressed requirements."

In both its oral and written orders, the court set a date by which Elwyn was to have retained his expert witnesses and provided either a formal report of their opinion or a summary thereof. Instead, Elwyn filed with the court a list of experts that had little, if any, substantive knowledge of the case.

¶ 41.　Elwyn's allegations of "hardball" litigation tactics and an inherently unreasonable scheduling order are similarly unavailing. Given the sheer number of potential expert witnesses identified in Elwyn's Expert Witness List, his ambiguous language concerning the opinions they purportedly held, and the limited time in which the trustee and William had to disclose their experts (approximately two months after Elwyn's disclosure), we conclude that counsel's efforts to promptly depose Elwyn's experts were a necessary response to Elwyn's inadequate disclosure. We also discern no inherent unfairness in the trial court's scheduling order, particularly given that Elwyn made no attempt to request an extension of the expert disclosure deadline prior to the deadline itself.

¶ 42.　Accordingly, we conclude that the court did not erroneously exercise its discretion in striking Elwyn's expert witnesses.

V.

¶ 43.　We next address Elwyn's claim that the trial court erred in refusing to join his son, Nate, as a party to the lawsuit. Elwyn's counsel made two attempts to join Nate as a party, both of which the trial court rejected as untimely.

¶ 44.　The first attempt was a "Motion to Add Party" filed on Elwyn's behalf, in which Elwyn claimed that Nate was a necessary party. A defending party may

implead "a person not a party" to an action if the person is a "necessary party" under WIS. STAT. § 803.03. *See* WIS. STAT. § 803.05. A party is a "necessary party" if he or she is "subject to service of process" and if either of the following circumstances is present:

 (a) In the person's absence complete relief cannot be accorded among those already parties; or

 (b) The person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may:

 1. As a practical matter impair or impede the person's ability to protect that interest; or

 2. Leave any of the persons already parties subject to a substantial risk of incurring double, multiple or otherwise inconsistent obligations by reason of his or her claimed interest.

Section 803.03(1). Whether a party is a necessary party is a question of law that we decide de novo. *See Dairyland Greyhound Park, Inc. v. McCallum,* 2002 WI App 259, ¶ 10, 258 Wis. 2d 210, 655 N.W.2d 474, *review denied,* 2003 WI 1, 258 Wis. 2d 110, 655 N.W.2d 129 (Wis. Nov. 12, 2002) (No. 02–1204).

■

¶ 45. We conclude that Nate is not a necessary party to this action. Neither circumstance set forth in WIS. STAT. § 803.03(1) is present. Nate's absence from this lawsuit does not deny "complete relief . . . among those already parties," and neither does Nate possess "an interest relating to the subject of the action" that must be protected or that would subject the existing parties to multiple obligations. Section 803.03(1)(a),

(b). Even if Elwyn were successful in invalidating the challenged trust, the assets would either be distributed to Elwyn, who is Arthur's sole heir, or, as William maintained in his standing argument, those assets would be subject to Arthur's immediately preceding trust, of which William was also the primary beneficiary. Under either possibility, Nate would acquire no interest in the assets. We thus conclude that the trial court did not err in denying Elwyn's motion to join Nate as a party to the action.[14]

¶ 46. The second attempt by Elwyn's counsel to join Nate was by way of a "Motion for Leave to Intervene" filed on Nate's behalf. A motion to intervene must be "timely" filed. *See* WIS. STAT. § 803.09. There is no "precise formula" for determining whether a motion to intervene is timely, and therefore the question of timeliness "must necessarily be left to the discretion of the circuit court." *State ex rel. Bilder v. Township of Delavan*, 112 Wis. 2d 539, 550, 334 N.W.2d 252 (1983). Relevant factors include whether the movant acted promptly and whether the movant's delay in bringing the motion for intervention will prejudice the existing parties to the case. *Id.* For example, in *State ex rel. Jones v. Gerhardstein*, 135 Wis. 2d 161, 168–69, 400 N.W.2d 1 (Ct. App. 1986), *aff'd,* 141 Wis. 2d 710, 416 N.W.2d 883 (1987), we affirmed the trial court's denial of a motion to intervene on the grounds that: (1) it was brought more than seven months after the action

---

[14] Although the trial court stated that its "primary focus" in rejecting Elwyn's motion was its tardiness, we affirm the trial court's ruling given that "it is immaterial what ground the trial court assigned as the reason for his ruling if it be in fact correct." *See Haswell v. Reuter,* 171 Wis. 228, 231, 177 N.W. 8 (1920).

was commenced; (2) the action was at a critical stage; and (3) there was no reason for the delay.

¶ 47. This case presents facts similar to those in *Jones*. In denying the "Motion for Leave to Intervene," the court noted that the matter had been on the trial calendar "for over a year," that a motion for summary judgment was pending, that the subject of joining Nate had been raised months earlier at the scheduling conference, and that there was no apparent reason for the delay in filing the Motion for Leave to Intervene. These concerns parallel those that we deemed sufficient in *Jones* to warrant the denial of a motion to intervene as untimely. Thus, as in *Jones*, we conclude that the trial court did not erroneously exercise its discretion in denying Elwyn's motion to intervene.

## VI.

¶ 48. We next address Elwyn's argument that the trial court erred with respect to the issue of sanctions. William and the trustee moved for the imposition of sanctions against Elwyn and/or his counsel on two grounds: (1) for bringing and maintaining an allegedly frivolous undue influence claim; and (2) for Elwyn's violation of the scheduling order regarding the disclosure of expert witnesses. The trial court stated at the conclusion of the sanctions hearing that "it appears to me that there is going to be some imposition of sanctions here in one or more of those categories." The appealed judgment, however, states only that "the matter of sanctions remain[s] open and subject to further order of the Court." Elwyn filed his notice of appeal prior to the court's taking further action on the sanctions issues.

578

¶ 49. An aggrieved party may appeal a judgment or order which " 'disposes of all of the substantive causes of action between the parties,' " notwithstanding the fact that a claim for attorney fees remains pending in the trial court. *See Laube v. City of Owen*, 209 Wis. 2d 12, 14–16, 561 N.W.2d 785 (Ct. App. 1997) (citation omitted). That is what Elwyn has done here—he appeals the judgment dismissing his challenges to the validity of the trust at issue but which leaves open the issue of whether Elwyn or his counsel will be ordered to pay a portion of the attorney fees incurred by William or the trustee in responding to his claims. With respect to the sanctions issue, the appealed judgment was not a "final judgment or a final order," and the issue is not properly before us. *See* WIS. STAT. § 808.03(1); *Sell v. Thompson & Coates, Ltd.*, 163 Wis. 2d 765, 777, 472 N.W.2d 834 (Ct. App. 1991) (dismissing attempted appeal of a frivolousness finding where trial court "reserved ruling" and the "record is silent as to whether further action was taken").

¶ 50. Quite simply, we do not know what sanctions will be imposed against whom in what amounts or for what reasons. We therefore remand to the trial court for entry of a final order or judgment regarding the payment of attorneys' fees as sanctions. We note that the trustee and William have also moved this court for attorneys' fees under WIS. STAT. RULE 809.25(3) on the grounds that Elwyn's appeal is frivolous. Although we have rejected Elwyn's claims of error, we cannot conclude that his argument concerning the validity of the trust execution lacked any basis in law or equity. Because the entire appeal was not therefore frivolous, we deny the motions for attorneys' fees under RULE

809.25(3). *See Tennyson v. School Dist. of the Menomonie Area*, 2000 WI App 21, ¶¶ 33–35, 232 Wis. 2d 267, 606 N.W.2d 594. Moreover, because Elwyn's attempt to appeal the imposition of sanctions for frivolousness is premature, the rule of *Riley v. Isaacson*, 156 Wis. 2d 249, 456 N.W.2d 619 (Ct. App. 1990), does not apply. *See id.* at 263 (holding "that a party prevailing in the defense of an award of fees under sec. 802.05 is also entitled to a further award on appeal without a finding that the appeal itself is frivolous under RULE 809.25(3), STATS.").

## CONCLUSION

¶ 51. For the reasons discussed above, we affirm the appealed judgment and remand for further proceedings on the issue of sanctions.

*By the Court.*—Judgment affirmed and cause remanded with directions.