PER CURIAM.
¶1 Thomas Schmidt appeals a judgment dismissing his undue influence claim in which Thomas sought to invalidate two amendments to a trust created by his late mother, Dora.[1] Thomas first argues the circuit court erroneously exercised its discretion when it denied his request for a trial continuance, made one day prior to trial, due to health issues that he claimed prevented him from traveling from Hawaii to attend the hearing. Thomas also argues the court applied an incorrect standard of law to his undue influence claim, and that the evidence he presented during his telephonic testimony was sufficient to withstand a motion to dismiss at the close of his case. We reject these arguments and affirm.
BACKGROUND
¶2 Thomas filed the present action in March 2016, seeking to invalidate two amendments to the Frank and Dora Schmidt Trust dated March 12, 2001. According to the complaint,[2] Thomas and his brother Robert were Frank and Dora's only two children. In approximately October 2004, Frank and Dora amended the trust to require the transfer of the real estate titled in the trust's name to Robert. Previously, some of the real estate was intended for eventual transfer to Thomas. The complaint alleged Frank was in a poor state of health at the time of the October 2004 amendment.
¶3 Frank died in January 2005, and Dora appointed Robert her power of attorney and co-trustee of the trust. Upon Frank's death, the trust was to be divided and administered as two separate trusts, the "Survivor's Trust" and the "Decedent's Trust."[3] Dora allegedly executed a promissory note obligating the Survivor's Trust to pay to the Decedent's Trust approximately $386,000, which represented the value of real estate originally intended to be apportioned into the Decedent's Trust. Thomas alleged this transaction was designed to clear a mortgage on the real estate held in the Survivor's Trust's name, and that the transaction would accelerate the transfer of the real estate out of the trust and to Robert and his wife Mary.
¶4 In February 2008, Dora amended the Survivor's Trust to include an in terrorem clause that would disinherit any beneficiary of the Survivor's Trust who challenged, contested or opposed the trust's validity. Thomas alleged that this amendment was the result of Robert "relentlessly pressuring Dora" and attempting to convince her that Thomas would ultimately challenge the Survivor's Trust once he learned of the real estate transfer to Robert. The transfer of real property from the Survivor's Trust to Robert allegedly occurred in April 2008.
¶5 Dora began residing at a nursing facility in 2013. The complaint alleges that, at about that time, Robert and Mary, as well as their two daughters Robyn and Rochelle, began speaking negatively about Thomas to Dora. Thomas alleged that this "constant negativity" caused a drastic change in Dora's attitude toward him, and that Robyn or Rochelle would prevent him from speaking to Dora alone.
¶6 Robert died in 2014, and Rochelle was allegedly named Dora's power of attorney. Thomas asserted at trial that he requested a copy of the Survivor's Trust documents numerous times from Robert during his life and Rochelle but was rebuffed by them. Eventually, Thomas filed an action in Door County seeking to compel Rochelle, in her capacity as Dora's power of attorney, to furnish him with a copy of the Survivor's Trust. Shortly thereafter, in January 2015, Dora amended the Survivor's Trust to remove Thomas as a beneficiary. Thomas's share was to be divided amongst Dora's grandchildren and great-grandchildren at the time of her death. Dora died later in 2015.
¶7 Thomas filed the present action seeking to set aside, on undue influence grounds, two of the trust amendments: (1) the 2008 amendment that adopted the in terrorem clause; and (2) the 2015 amendment that removed Thomas as a beneficiary. Thomas alleged that Dora was susceptible to undue influence at the relevant times given her age, physical and mental health, and personality, and that Robert, Mary, Robyn and Rochelle sought to influence Dora to remove Thomas as a beneficiary given their "apparent jealousy and hatred" of him. Alternatively, Thomas alleged that Dora was in a confidential relationship with those four family members and that suspicious circumstances existed surrounding the 2008 and 2015 amendments to the Survivor's Trust.
¶8 The trial in the matter was originally scheduled for August 24 and 25, 2017. Thomas, who lived in Hawaii throughout these proceedings, retained local counsel and began gathering evidence for the trial. However, his attorney requested an adjournment based upon Thomas's inability to access his condominium unit in Hawaii because of a fire in the complex. The trial was rescheduled for March 23, 2018.
¶9 On March 21, 2018, Thomas, by this point proceeding pro se, faxed the circuit court a motion for a continuance based upon a medical disability. The fax submission included a letter from a Dr. Leah Ridge dated March 20, 2018, representing that Thomas was unable to travel to Wisconsin for the March 23 hearing due to a medical condition, but without providing any details as to the condition or why it prevented Thomas's travel. At a motion hearing the following day, multiple parties objected to the continuance motion, and the court requested more information about Thomas's condition.
¶10 Thomas, appearing by telephone, stated he had been in physical therapy for one and one-half years following an automobile accident. He also stated that in November 2017, his condition was reaggravated after he was attacked by a man with a skateboard while riding on his mobility scooter. The court asked whether Thomas had purchased his airline ticket so as to be present in Wisconsin the following day, and Thomas responded that he had not done so but he had sufficient airline points to book a day-of flight to Chicago. However, opposing counsel's research showed that, given the available flights, Thomas would be unable to be present for the trial no matter the outcome of the motion hearing.
¶11 Thomas acknowledged that he had known for some time he would be unable to travel, but he stated that until recently, he was "optimistic" the parties would reach a settlement agreement. Thomas also represented that he had tried to retain his previous attorney to represent him at trial, but the attorney declined because he would not have sufficient time to prepare. Opposing counsel noted Thomas had traveled to Wisconsin for depositions just over one year before the motion hearing.
¶12 The circuit court ultimately denied the continuance request, noting the accidents that precipitated Thomas's unavailability had occurred between four and eighteen months prior to the motion hearing, yet Thomas had waited until less than forty-eight hours before the trial to notify the court and the parties of his unavailability. The court observed that Thomas appeared to be "going on the assumption I was just going to take this off the calendar," and it stated it could "reach no other conclusion [than] that you are stalling regarding this matter and don't want this matter litigated and heard." As to the latter point, the court noted the matter had been previously adjourned due to the fire in Thomas's condominium.
¶13 Thomas elected to participate in the trial by telephone, and he was permitted to make a narrative testimonial statement of the events he believed relevant to his undue influence claim. The testimony generally mirrored the allegations of the complaint, with Thomas adding details of an alleged $400,000 promissory note from Robert to Frank related to efforts by the family to keep Robert out of trouble for having embezzled from his employer. Thomas claimed the note should have been made an asset of the Survivor's Trust, but he stated he "could never find it."
¶14 Thomas testified regarding the distributions he believed he would receive from the trust assets, but he stated he never asked his father for details. Regardless, Thomas testified that "after about four attempts [Robert] finally got my sick, old father to sign a trust under duress." Thomas testified that Robert was Frank's "caretaker" and that Frank was "weak and probably did not know the complex implications of what he was signing." Thomas then testified that in 2007 Robert "used undue influence to collar [his] mother into transferring the farm to himself defrauding all other beneficiaries." According to Thomas, it was following that act that the trust was amended to include the in terrorem clause.
¶15 Thomas described visiting Dora in 2006, when he thought Dora seemed "a little lost" following Frank's death. Thomas testified to his visiting Wisconsin to spend a month with Dora every summer between 2007 and 2012. Thomas testified that in 2013 Dora began having unspecified "serious medical issues" and was placed in the nursing facility, which she was "fine in adjusting to." There was testimony regarding various instances of hostility by Robert and his family toward Thomas when Thomas would visit from Hawaii. Thomas also described his repeated efforts to get a copy of the trust documents, eventually culminating in his lawsuit in Door County.
¶16 According to Thomas, shortly after he filed the petition in that action, he received a phone call from Dora in which she stated, "You sued me. How could you do this? I can't pay these expensive attorney's fees." Dora stated she was "done" with Thomas and subsequently amended the Survivor's Trust to remove Thomas as a beneficiary. However, Thomas also testified that based on his conversations with his mother, she "obviously did not know what was in the trust or understand it, but she told me I was getting a piece of the farm and that was not true." Thomas testified his mother had an eighth-grade education and could not comprehend a legal document.
¶17 When Robert died, Thomas testified he was barred from the funeral proceedings. He testified that when he would try to speak with Dora alone, a staff member from the nursing facility would follow him and, later, either Rochelle or Robyn would arrive at the nursing home and talk over him. However, he acknowledged that when staff asked Dora whether she would like Rochelle or Robyn to leave, she would say "no." Thomas testified he took this as an indication that Dora was "a completely controlled prisoner and I couldn't talk to her." Thomas continued that he had a hearing-impaired phone installed in Dora's room, but after about a year Rochelle had the phone removed.
¶18 After a brief recess, Thomas resumed his testimony and appeared to read verbatim from an earlier filing his attorney had drafted in response to a motion to dismiss his claims. Thomas presented no other witnesses and no documentary evidence, although he attempted to read from the affidavit of a deceased individual, which testimony the circuit court barred on hearsay grounds.
¶19 At the close of Thomas's case, the circuit court granted two separate motions to dismiss brought by the defense.[4] The court first granted a motion dismissing as parties all named defendants whose conduct Thomas had not challenged as unduly influential during his narrative testimony.[5] The court also granted a motion to dismiss the remaining defendants, including Mary, Rochelle and Robyn. The court acknowledged Thomas's testimony regarding the family's hostility toward him and an "unfortunate breakdown in a family relationship," but it concluded Thomas had not established a prima facie case of undue influence because he had not presented any evidence tending to show that Dora was susceptible or lacked competence to validly amend the Survivor's Trust. Thomas now appeals.
DISCUSSION
¶20 We first address whether the circuit court properly denied Thomas's request for a continuance. We review a decision to deny a motion for a continuance using the erroneous exercise of discretion standard. Schwab v. Baribeau Implement Co. , 163 Wis. 2d 208, 216, 471 N.W.2d 244 (Ct. App. 1991). We will affirm a circuit court's discretionary decision if the court makes a rational, reasoned decision and applies the correct legal standard to the facts of record. Hokin v. Hokin , 231 Wis. 2d 184, 190, 605 N.W.2d 219 (Ct. App. 1999). Additionally, the appellant must demonstrate prejudice arising from the denial. Schwab , 163 Wis. 2d at 216.
¶21 When considering a motion for a continuance, a circuit court should consider relevant factors including the length of the requested delay, whether other continuances were granted, the reason for the request, and whether the parties, witnesses and the court would be inconvenienced. State v. Wollman , 86 Wis. 2d 459, 470, 273 N.W.2d 225 (1979). Thomas acknowledges the court considered these factors, but he asserts the "weight the court gave to them was disproportionate." Essentially, he contends that a consideration of these factors should have led the court to reach the opposite conclusion.
¶22 However, Thomas never truly joins issue with the circuit court's reasoning. The court determined Thomas was dilatory in raising the issue of his medical condition, and Thomas's only response to this reasoning on appeal is to claim it would have been "premature to raise the issue in December 2017 ... because he would not have known then whether he would be able to travel three months later." To the contrary, it would not have been premature to notify the court, at that time, of a potential medical concern that could affect Thomas's trial availability, and the court implicitly found there was no good reason for Thomas not to have given such notice. Moreover, the court made a finding that Thomas was attempting to delay litigating the matter-a reasonable conclusion based on the information available to the court, including the fact that Thomas had not yet purchased an airline ticket to return to Wisconsin and there were no flights available for him to arrive in time for the scheduled hearing. Thomas makes no effort to challenge the court's finding regarding his motivation for seeking the continuance.
¶23 Next, Thomas argues the circuit court applied an incorrect legal standard when it granted the motion to dismiss his undue influence claim at the close of his case. He contends the court was improperly focused on Dora's competency to amend the Survivor's Trust as opposed to the proper standards for undue influence. He also contends the evidence he presented by his testimony was sufficient to withstand a motion to dismiss.
¶24 A motion to dismiss at the close of the plaintiff's case tests the legal sufficiency of the evidence. Weiss v. United Fire & Cas. Co. , 197 Wis. 2d 365, 388, 541 N.W.2d 753 (1995). A circuit court may not grant such a motion unless it finds, as a matter of law, that there is no credible evidence from which the factfinder could reach a verdict for the plaintiff. Id. Because the court is in a superior position to judge the weight and relevancy of the testimony, we accord its decision substantial deference and will not reverse unless the court was "clearly wrong." Id. at 388-89. A court is "clearly wrong" when it grants a motion to dismiss despite the existence of credible evidence to support the claim. Id. at 389.
¶25 There are two methods of proving undue influence related to a transaction involving a settlor's trust. The first method requires proof of the settlor's susceptibility to undue influence, together with the opportunity and disposition to influence on the part of the wrongdoer and the achievement of a coveted result. Glaeske v. Shaw , 2003 WI App 71, ¶27, 261 Wis. 2d 549, 661 N.W.2d 420. In the alternative, the plaintiff may show that a confidential or fiduciary relationship existed between the settlor and the alleged wrongdoer, and that there were suspicious circumstances surrounding the amendment of the trust. Id.
¶26 We conclude the circuit court properly examined the evidence Thomas presented with respect to both methods of proving undue influence. As an initial matter, we agree with the court that Thomas's testimony, if accepted by the factfinder, did little more than establish that some family members bore a significant degree of hostility toward him. There was scant factual evidence that those family members exercised undue influence over Dora, other than Thomas's mere opinions that Dora was being controlled.
¶27 To be specific, there was only nominal evidence presented by Thomas's testimony regarding Dora's alleged susceptibility to undue influence. Thomas's testimony was general in nature and limited to the facts that Dora had only an eighth-grade education and that she had to be placed in a nursing home due to an unspecified medical condition. How physically ill Dora was, and whether her illness was of a nature that would affect her ability to make her own decisions, are highly relevant information but are unclear from the record in this case. See Johnson v. Merta , 95 Wis. 2d 141, 157, 289 N.W.2d 813 (1980) (observing it was "doubtful" the testator's physical illness significantly affected her ability to freely decide when the only evidence presented was that the testator was elderly and had been hospitalized for lung congestion). Moreover, the challenged amendment regarding the in terrorem clause was adopted in 2008, prior to Dora's placement in a nursing facility.
¶28 We acknowledge that the settlor's age, physical and mental health, and personality are all factors bearing upon the question of susceptibility. Id. at 156. However, these factors must demonstrate that the settlor was "unusually receptive to the suggestions of others and consistently deferred to them on matters of utmost personal importance." Id. at 156-57. There was virtually no evidence tending to show that Dora was susceptible to the will of the other family members. To overcome the presumption of validity attendant to testamentary instruments, the opponent of the testamentary document must prove undue influence by clear, satisfactory and convincing evidence. Sensenbrenner v. Sensenbrenner , 89 Wis. 2d 677, 685, 278 N.W.2d 887 (1979). Here, there is no credible evidence of susceptibility that could meet this standard.
¶29 Likewise, there was insufficient evidence of a confidential relationship to support a claim for undue influence under the alternative test. Although Thomas testified that members of Robert's family had various responsibilities relating to Dora's care, including various powers of attorney, he presented no documentary evidence to establish such relationships.[6] The scope and duration of these asserted powers of attorney are unclear. This absence of evidence is extremely problematic for Thomas, as the powers of an attorney-in-fact are strictly construed and are limited only to those powers clearly delineated or specified in the letters granting such authority. See Losee v. Marine Bank , 2005 WI App 184, ¶16, 286 Wis. 2d 438, 703 N.W.2d 751. Even if Thomas's minimal testimony was sufficient to establish a confidential relationship between Dora and some of Robert's family members, he fails to develop any meaningful argument about how suspicious circumstances played into the amendments.[7]
¶30 In all, we conclude the circuit court applied the correct legal standard and reached a proper conclusion regarding the insufficiency of the evidence to support Thomas's prima facie claim of undue influence. The court expressed some uncertainty about the precise amendments Thomas was challenging, which was understandable given the narrative history Thomas offered regarding the family's interactions. However, it ultimately correctly identified Thomas's challenges as going to the "changes and amendments to the trust" that Dora alone had made in 2008 and 2015. The court also correctly identified most of Thomas's testimony as being a chronicle of the family's hostilities, but it observed that "hostility doesn't make a case for undue influence or lack of testamentary capacity."[8] We agree with the court's ultimate conclusion that there was insufficient evidence regarding undue influence to support Thomas's claim.
By the Court. -Judgment affirmed.
This opinion will not be published. See WIS. STAT. RULE 809.23(1)(b)5.

Because many of the parties have the same surname, for ease of reading we will refer to individuals by their given names throughout this opinion.
This is an expedited appeal under Wis. Stat. Rule 809.17 (2017-18). All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.

Due to the fact that Thomas was unrepresented at the time of trial and offered his testimony via telephone in a lengthy narrative format, we elect to provide context for his testimony by setting forth the basic facts alleged in his complaint as well. Our review of the sufficiency of the evidence at trial, however, is based solely on Thomas's trial testimony, which was the only evidence he presented.

Thomas's claim pertains only to his status as a beneficiary of the Survivor's Trust.

Although the parties did not reference the statute, these motions to dismiss were presumably made pursuant to Wis. Stat. § 805.14(3), which permits a defendant to move for dismissal at the close of the plaintiff's case on the ground of insufficiency of evidence.

Thomas did not provide a response to this motion before the circuit court. On appeal, he asserts the dismissed parties were necessary parties under Wis. Stat. § 803.03. By not opposing the motion at the circuit court level, Thomas has forfeited his ability to challenge the court's ruling on appeal. See Associated Bank, N.A. v. Brogli , 2018 WI App 47, ¶27, 383 Wis. 2d 756, 917 N.W.2d 37.

Indeed, more broadly, Thomas presented no documentary evidence for any of his claims, including to support his testimony regarding Robert's alleged embezzlement and subsequent execution of a promissory note.

Thomas's argument on this point is limited to a single sentence: "There were suspicious circumstances surrounding the execution of the amendment removing Thomas Schmidt as a beneficiary of the Survivor's Trust in that it was obtained through their deceit in lying to Dora Schmidt about Thomas Schmidt and the nature of the case he brought against the trust." Thomas cites no authority for the proposition that another family member's "lying" to the settlor can constitute suspicious circumstances. Rather, typically these considerations include the haste with which the document was drafted, the settlor's weakened condition, and odd behavior by the settlor in the time frame in which the document was executed. See Vargo v. Beaudry , 46 Wis. 2d 230, 241, 175 N.W.2d 473 (1970).

"The element of susceptibility to undue influence is not to be confused with the question of competency to make a will." Odegard v. Birkeland , 85 Wis. 2d 126, 140, 270 N.W.2d 386 (1978). This rule appears to be the basis for Thomas's claim that the circuit court applied an incorrect legal standard. However, we do not perceive the court to have truly conflated the two concepts, but rather it used them as a shorthand method of referring to the notion of Dora adopting an amendment that was not truly of her own making.